## THE SNUG HARBOR.

### UNITED STATES v. EASTERN TRANSP. CO. et al.

### No. 2929.

Circuit Court of Appeals, Fourth Circuit. April 8, 1930.

See, also, 272 U. S. 675, 47 S. Ct. 289, 71 L. Ed. 472; 283 F. 1015.

H. H. Rumble, Sp. Asst. to Atty. Gen. (Paul W. Kear, U. S. Atty.; of Norfolk, Va., M. H. Avery, Admiralty Atty., U. S. Shipping Board, of Washington, D. C., and J. Frank Staley, Sp. Asst. to Atty. Gen., on the brief), for the United States.

Edward R. Baird, Jr., and George M. Lanning, both of Norfolk, Va. (Baird White & Lanning, of Norfolk, Va., on the brief), for appellees.

Before WADDILL, PARKER, and NORTHCOTT, Circuit Judges.

NORTHCOTT, Circuit Judge.

On August 15, 1920, the steamship Snug Harbor, owned and used by the United States, and operated by the Shipping Board solely as a merchant vessel, while on a voyage from Baltimore, Md., to Portland, Me., with a carload of coal, came into collision with the barge Pottsville in tow of the tug Covington and sank in Block Island Sound, at a point of 4½ miles east by north of Montauk Point Light. The Snug Harbor, a steel vessel, was abandoned by her officers and crew immediately after the collision, and shortly afterwards sank in approximately about 40 feet of water, and was a total loss.

On September 14, 1920, and within 30 days of the sinking of the Snug Harbor, the barges Winstead and the Vermillion, loaded with coal and in tow of a tug, while on a voyage from Norfolk, Va., to Boston, Mass., without fault of those in charge of the tug or tow, through collision with the wreck, were sunk, and both the barges and their cargoes became a total loss.

Libels were filed by the owners of the barges and bailees of their cargoes, an order was entered consolidating the causes, and they were heard together. The United States appeared specially for the purpose of raising the question of the jurisdiction of the courts, so far as the United States was concerned. This issue on jurisdiction was presented by motion to dismiss, but was first denied by the District Judge. The Snug Harbor (D. C.) 283 F. 1015. Subsequently the judge reheard the suggestion of want of jurisdiction and reached the conclusion, on the facts alleged, that the court was without jurisdiction and dismissed the libels. At the instance of libelant, the question of jurisdiction was certified to the Supreme Court under section 238 of the Judicial Code (as it was before it was amended by the Act of February 13, 1925 [28 USCA § 345]). The Supreme Court, on January 3, 1927, reversed the District Court and remanded the cause for further proceedings. 272 U. S. 675, 47 S. Ct. 289, 71 L. Ed. 472.

A full discussion of the question of jurisdiction will be found in the able opinion of Mr. Chief Justice Taft, speaking for the court. In this opinion, the Chief Justice also discusses the question of abandonment under the allegation of the libels, which with regard to this question are admitted, and one of the headnotes to this opinion reads as follows: "Abandonment within the thirty day period set by the Act of March 3, 1899, will not be presumed of a wreck left in a navigable channel, for the purpose of relieving the owner from the consequence of failure to remove or mark it as that Act requires." Page 686 of 272 U. S., 47 S. Ct. 289, 71 L. Ed. 472.

In concluding his opinion, the Chief Justice said: "The cause of action grows out of the responsibility of the government for a merchant vessel which in the course of its employment had become a danger to navigation and which imposed a duty to avoid that danger. A wreck which is a total loss will not furnish basis for an action in rem, as we have assumed, but if a proceeding in admiralty permitted by the act embraces the principles both of suits in personam and suits in rem, it is a most natural construction of the act dealing with merchant vessels employed by the United States, to include as a suit in personam it permits, one for a tort caused by the negligence of the United States in dealing with a wreck of its merchant vessel and its failure to comply with its own navigation, laws therewith."

Answers were filed by the government, witnesses were heard, some in person and some by depositions, and the case submitted

on its merits. The judge below reached the conclusion that the United States was liable, and entered a decree in favor of the libelants in the sum of $211,217, with interest, from which decree this appeal was taken.

The learned judge below found it to be a fact that the collision between the Snug Harbor and the barge Pottsville occurred near the place where the Snug Harbor sank, and on this point the judge said: "It is much more likely, I think, that the collision actually occurred within considerably less than a mile of the place where the vessel sank. The manner in which she sank, however, left nothing above water to mark the spot."

It is not necessary to quote authorities as to the great weight to be given the findings of the trial judge on questions of fact. Such findings will not be disturbed unless we reach the conclusion that they are clearly wrong, that is, unless it appears that the judge has misapprehended the evidence or gone against the clear weight thereof. This principle has been laid down by this court a number of times, and we know of no authority to the contrary. Pendleton Bros. v. Morgan (C. C. A.) 11 F.(2d) 67; Standard Phosphate & Acid Works, Inc., v. Chesapeake Lighterage & Towing Co. (C. C. A.) 16 F.(2d) 765; Wolf, etc., Co. v. Minerals, etc., Corporation (C. C. A.) 18 F.(2d) 483; International Organization, United Mine Workers v. Red Jacket Consol. Coal & Coke Co. (C. C. A.) 18 F.(2d) 839; Virginia Shipbuilding Corporation v. United States (C. C. A.) 22 F.(2d) 38; Lewis v. Jones (C. C. A.) 27 F.(2d) 72.

The judge below also found as a fact that the collision occurred and the vessel sank in a navigable channel, and that section 15 of the Act of March 3, 1899, commonly known as the "Wreck Statute," applied. The pertinent portion of this statute reads as follows: "Whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidently or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as hereinafter provided for." U. S. Code title 33, § 409, 33 USCA § 409).

The trial judge also found that two other vessels were in collision with the sunken wreck of Snug Harbor, one on the 23d of August, and another on the 25th of August, and that reports of these collisions reached the Lighthouse Service of the United States and the local inspectors, at least four days prior to the sinking of the Winstead and Vermillion, and that no effort was made to locate and mark the obstruction between the time of the receipt of these reports and the sinking of the Winstead and Vermillion.

Three points are raised by the United States as relieving the owner of the Snug Harbor of the duty imposed upon it, under the Wreck Statute: First, abandonment by the owner; second, that the owner, having been advised in good faith by the master, that the Snug Harbor was lost in the Atlantic Ocean, was under no duty to search for or mark the wreck; and, third, that efforts of the Lighthouse Service, operated by the United States, to locate and mark the wreck, relieved the United States, as owner, of any liability.

On the first point, as to abandonment, Chief Justice Taft, speaking for the court in the Eastern Transportation Co. v. United States, supra, said: "Section 19 (33 USCA § 414) provides for a period of 30 days before abandonment is complete unless legally established in less time. Under the averments of the libel there is no presumption of abandonment, certainly not within the 30 days, merely to relieve the owner of the wreck of his affirmative duty during that time to protect commerce against its danger. People's Coal Co. v. Second Pool Coal Co. (D. C.) 181 F. 609, affirmed (C. C. A.) 188 F. 892. We do not think that abandonment is a factor in this case."

The trial judge also found against the respondent on this point, on the amended pleadings and the evidence, and we are of the opinion that his finding is clearly correct. It is contended on behalf of the appellant that what the Supreme Court said on this point was obiter dictum. We do not think so, and, in any event, we are of the opinion that the conclusion reached, as to abandonment, is correct.

On the second point, that the report of the master, that the place of the sinking of the vessel was at sea, relieved the owner of liability, we are of the opinion that the cir-

cumstances surrounding the sinking of the Snug Harbor were at least sufficient to put the Shipping Board upon notice that there was uncertainty as to the place of the sinking. The nearness, even as reported by the master, of the place of the accident to a navigable and much-used channel, where many vessels were constantly passing and in great danger of being sunk, as were the Winstead and the Vermillion, would, it seems to us, require some inquiry upon part of the Shipping Board and its agencies as to the place of the sinking. The collisions of the other vessels on the 23d and 25th, which were not only officially reported to the Lighthouse Service, but must have become known to the Shipping Board, demanded some action on the part of the owner of the Snug Harbor, and put the owner upon notice that there was doubt as to the place about her sinking. On August 19, inquiry was made by the Lighthouse Service of the Shipping Board as to the details of the sinking of the Snug Harbor, thus bringing directly home to the owner the knowledge of the uncertainty as to the exact location of the place of the sinking of the Snug Harbor, and giving the owner, that is, the Shipping Board, direct notice of the duties devolving upon it by virtue of the Wreck Statute. In spite of all these circumstances, nothing was done by the owner of the vessel, no move made by the Shipping Board or any of its employees or agents to locate the wreck and mark it. No efforts were made whatever by the Shipping Board to perform its duties under the law. Throughout the entire case the Shipping Board has, according to the record, been silent. Not one of its officers or agents or employees testified in the case, and the attitude of the Board throughout shows an utter disregard of the interest, which even in the absence of the statute it should have shown for the safety of those engaged in navigation.

Moreover, the master of the Snug Harbor had every incentive to report her loss as at sea and not in the navigable channel. He had been navigating for hours in a dense fog, and from his own testimony, was at least uncertain as to his position. To admit that the collision occurred where the judge found it did occur, was to admit his own fault as a navigator. To allow the owner to be excused by the mistaken erroneous or false report of the master of the vessel, his own agent and employee, for whose mistakes he is liable, would in many instances, render the statute impotent. We are of the opinion that the report of the master, under the circumstances, in no wise excused the owner from, at least, some efficient effort, to locate and mark the wreck. The absence of any such effort fastens liability on the owner.

In considering the third point, as to whether the activities of the Lighthouse Service, another branch of government operation from the Shipping Board, as owner of the Snug Harbor, excused the owner from liability, we must keep in mind the fact that the United States, as owner of the sunken vessel, stands in the same position as a private owner. It is not necessary, however, to decide the question of whether the United States, operating the Lighthouse Service, by the activities of that Service, is relieved of a duty imposed by the statute, for the reason that the judge below found as a fact that what the Lighthouse Service did was not properly done and was not a sufficient effort, under the circumstances, to find or mark the wreck. In this conclusion we agree with the trial judge, and a careful consideration of the evidence leads us to the conclusion that, not only was the trial judge right, but that he could scarcely have reached any other conclusion. On this point the judge below said:

"But it is insisted on behalf of respondent that on August 19th the Lighthouse Department undertook the duty of searching for and finding and marking the wreck; that, in so doing, this department of the government acted in the discharge of a public function; and that, from the time it undertook the work, respondents were relieved of any further obligation to the same extent as though formal abandonment by notice to the Secretary of War had occurred. The Utopia (1893) App. Cas. 502; The Plymouth (C. C. A.) 225 F. 483; The R. J. Moran (C. C. A.) 299 F. 500, 1924 A. M. C. 796; The City of Taunton (D. C.) 11 F.(2d) 285, 1927 A. M. C. 135; The Oregon Horaisan Maru (D. C.) 27 F.(2d) 185, 1928 A. M. C. 794, are cited in support of this principle. I have examined these cases carefully, and I do not think they go the extent claimed. They do hold that, when the wreck is found, and the Lighthouse Service, either voluntarily or at the request of the owner, buoys and lights the wreck, the owner may not thereafter be held for damage caused by the faulty way in which the work is done. This is so because, when they act with respect to marking a wreck, they act officially, and because the owner, though he may believe a better and safer way should be adopted, is not authorized for that reason to challenge or change what they have done. But there is no obli-

gation on the Service to find a wreck. On the contrary, this duty is imposed on the owner, and though the Service may extend its facilities to the owner to aid in finding the wreck in the interest of safe navigation, such action on its part does not pre-empt the field or excuse the owner from the personal performance of a duty imposed by law. I am constrained to hold, therefore, that, notwithstanding the efforts of the Lighthouse Service to find the wreck, the continuing obligation of the owner, either formally to abandon or to use due diligence to find, continued unabated. * * *

"The question, therefore, is: Was the work done by the Lighthouse Service of that nature and character that fulfilled the responsibility placed by statute on the owner of a sunken craft? Much testimony has been taken, and—condensed—it shows that upon the receipt of the master's report of the sinking, inquiry was made from time to time of lobster fishermen, habitually using Block Island Sound, in an effort to ascertain if any had information of the location of the wreck. On August 28th, an order was issued to the lighthouse tender Tulip directing her to search for the wreck and buoy it if found, and on September 1st and 2d the Tulip, while on a voyage between New England ports, cruised the waters in and around Montauk Point for seven hours in an effort to find the wreck. If any part of it had been visible above water, the search doubtless would have resulted successfully; but, since it was wholly submerged, the attempt was almost necessarily abortive. Doubtless those in charge of the Tulip, while carefully performing the order to locate the wreck, would have adopted other and more certain means of accomplishing the result sought, if the vessel and her crew had been exclusively allocated to this special job. But this was not the case; the search was directed to be performed while on a regular trip on other business. The officers charged with the duty of searching had nothing more than general information of the sinking to guide them in finding the obstruction. They had not communicated with the officers of the Snug Harbor, or with the officers of the barge with which she collided, nor had the latter apparently communicated with them. No effective effort was made by the Service to obtain specific and definite information from any source, doubtless because it was realized that the duty of finding the wreck was primarily some one else's. Two other vessels were in collision with the wreck some three weeks later, one on the 23d of August, and another on the

25th, and reports were made, at least 4 days prior to the sinking of the Winstead, to the local inspectors and to the Lighthouse Service of these collisions. These reports were in themselves notice that the wreck was a danger to shipping and imposed the duty of further search. The first step in the discharge of this duty demanded prompt inquiry of the officers of these vessels to ascertain what information they had, and quick action on the information then at hand. If the well-recognized method of ascertaining the location of a submerged wreck had been adopted, the ensuing loss and damage might have been avoided. When the opportunity was allowed to pass unnoticed, the responsibility for the failure may not be avoided by suggesting the probability of its lack of success. Upon the assumption, therefore, that the United States is entitled to credit for the things done by the Lighthouse Service, a fair weighing of it all does not meet the plain requirements of the statute, for, while it may not be asserted with certainty that during the interval between the receipt of the report of damage to other vessels and the sinking of the Winstead, the wreck would have been found, it may not be asserted with any greater assurance that it would not. The question is not so much whether the effort to find the wreck would have been successful as whether the duty which the statute imposes to do all reasonable things to that end was obeyed."

We are of the opinion that the United States, as owner, must bear the loss, and the judgment of the court below is affirmed.

WADDILL, Circuit Judge, presided at the hearing of this case, but, owing to illness, did not participate in the decision.