**BERWIND–WHITE COAL MINING CO. v. PITNEY et al.**

**THE EUREKA NO. 110.**

**THE ST. CHARLES.**

No. 153, Docket 21877.

United States Court of Appeals Second Circuit.

Argued Jan. 8, 1951.

Decided March 20, 1951.

Frank, Circuit Judge, dissenting in part.

Burlingham, Veeder, Clark & Hupper, New York City, Chauncey I. Clark, Frederic Conger, New York City, of counsel, for Berwind-White Coal Mining Co.

John J. McElhinny, New York City, for Shelton Pitney and Walter P. Gardner, as Trustees of Central R. Co. of New Jersey.

Irving H. Saypol, U. S. Atty., Leo J. Curran, New York City, for United States.

Macklin, Speer, Hanan & McKernan, New York City, Gerald J. McKernan, Martin J. McHugh, New York City, of counsel, for Tracy Towing Line, Inc. and Allen N. Spooner & Son, Inc.

Pyne, Lynch & Smith, and Warner Pyne, all of New York City, for Amboy Tow-Boats, Inc.

Foley & Martin, New York City, Christopher E. Heckman, New York City, of counsel, for Cleary Bros.

Before CHASE, CLARK and FRANK, Circuit Judges.

CHASE, Circuit Judge.

On November 15, 1944, at about half past nine in the evening, the loaded coal barge Eureka No. 110, owned by the appellant Berwind-White Coal Mining Company, was at Pier 18, Communipaw, New Jersey and was leaking so badly that she was in danger of sinking. The pier was owned by the Trustees of The Central Railroad Company of New Jersey, herein called the railroad, and a tug of the railroad then tried to beach her on some nearby mud flats but failed, and the barge became a wreck at about 10:00 P. M. in the navigable channel leading to, and past, the pier. While there, and before she was marked, the following vessels struck her and were damaged: At 12:35 A. M. on November 16, 1944, the tug Ann Marie Tracy, which was owned by Tracy Towing Line, Inc.; at 5:15 A. M. on the same day, the tug St. Charles, owned by Amboy Towboats, Inc., and her tow, the scow Cleary No. 72, owned by Cleary Brothers and under charter to the United States, rode up to hit the St. Charles and was damaged; at 8:30 A. M. on the same day, the tug Osprey, owned by Allen N. Spooner & Son, Inc.

As a result of these mishaps the following actions were brought in the Southern District of New York: The appellant filed a petition for exoneration from liability and, in the alternative, for limitation, and also sued the railroad for the damage to its

barge. The railroad, the United States, Cleary Brothers, Tracy Towing Line, Inc., Amboy Towboats, Inc., and Allen N. Spooner & Son, Inc., all filed claims in the limitation proceedings, and the latter two each filed libels against the railroad to recover the damages sustained by their respective tugs. Cleary Brothers sued the United States as the charterer of its scow and the United States impleaded Amboy Towboats, Inc., in that action. The latter then impleaded the railroad. All of these actions were consolidated for trial which ended in the entry of an interlocutory decree dismissing on the merits both the petition of the Berwind-White Coal Mining Company for limitation and its libel against the railroad. The claims of Amboy Towboats, Inc., Allen N. Spooner & Son, Inc., Tracy Towing Line, Inc., and Cleary Brothers were allowed against the petitioner in the limitation proceedings for the damages sustained by their respective vessels. The libels of Amboy Towboats, Inc., and of Allen N. Spooner & Son, Inc., against the railroad were dismissed, and so was that of Cleary Brothers against the United States, together with the impleading petitions of the United States and of Amboy Towboats, Inc. The Berwind-White Coal Mining Company appealed, and Cleary Brothers, Amboy Towboats, Inc., and Allen N. Spooner & Son, Inc. filed assignments of error.

When the Eureka No. 110 was raised after the sinking it was found that the ninth bow plank down from her deck had been sprung near its end on the starboard side. The opening so made in that vicinity was adequate to account for taking the water which brought on her sinking and was the only reason discovered to account for it.

The appellant's position briefly is that the railroad is liable for the damage to its barge as its sinking condition was due to the fault of the railroad in bringing the side of it up against a protruding wearing piece

on the pier while the barge was being moved along the pier after loading, and further that it may limit any liability of its own for damage caused by the wreck. That of the claimants in the limitation proceedings as regards the appellant is that it failed to mark the wreck as required by Sec. 409 of Title 33 U.S.C.A.[1] and was personally negligent in that failure. That of the others need not be stated more explicitly for reasons which will appear.

It was proved and found substantially as follows:

Pier 18 is a very busy one, with two coal dumpers which often load twenty-five or more barges a day. These barges are brought in to the inshore end of the pier light and after one is moved under one of the dumpers and loaded with coal it is hauled along the pier toward the offshore end to be picked up and towed away. This hauling is done by cable from winches on the pier, the cable being fastened to a cleat on the pier side of the barge. This movement of the barge has a tendency to keep it close to, or rubbing on, the side of the pier.

There was a wearing piece which stuck out from the side of the pier in such a way that it might have caused the dislocation of the ninth plank on the barge provided the barge hit it there with sufficient force. And there was some evidence to the effect that after the barge was loaded she drew so much water that at certain stages of the tide the protruding wearing piece might have been about at the height of the damaged part of the barge. To find such a situation, however, certain inferences would have to be drawn from rather inconclusive calculations and the trial judge did not draw them and was unable to find that the damage to the barge was caused by its hitting the pier. Clearly this was only a failure to find a disputed fact on evidence not conclusive and so is not error. It is probable that the barge was already dam-

1. This statute provides in its now pertinent part that, " * * * And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to im-

mediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned * * * "

aged in the respect described, when she was brought under the dumper for loading. But, if so, there was insufficient evidence to show that the railroad knew, or should have known, that. The barge had been lying at the pier for a day or two empty but for some twenty-five tons of coal along her starboard side which caused her to list a little toward the pier. The trial judge justifiably found that a person on the pier could not see the place where the damage was found unless he leaned over the pier to look for it.

Before the loading was completed the bargee had sounded his barge and found but 2½ inches of water. After the barge was loaded, however, the bargee sounded again about 8:30 P. M. and found 18 inches. The barge was then listing four or five inches to starboard and the bargee went ashore for help. One tug tried unsuccessfully to give assistance and then the railroad's tug Allentown came and attempted to siphon the barge. This proved impossible, so the Allentown pulled her away at about half past nine to beach her as above stated.

The barge had a wooden, false roof to protect the roof of her cabin from falling coal, and after she sank a flag pole on the false roof remained above water. The captain of the Allentown had a lantern made fast to that to mark the wreck, but the false roof floated free, and the tug towed it back to the pier and removed the lantern. Meanwhile the bargee had been on shore and had telephoned information as to the plight of the barge at the pier which was transmitted to Mr. Nelson, the general foreman of the appellant. He sent two employees with a pump to the pier, but they did not get there until after the Allentown had towed the barge away.

The Allentown returned to the pier at about 10:20 and reported the sinking of the barge to the representatives of the railroad. The bargee and the two pump men sent by Nelson then learned of the sinking and were told by some unidentified person on the Allentown that the sinking had been reported to the railroad which would report it to the Coast Guard. One of the pump men then telephoned the appellant's

general foreman Nelson of the sinking and told him that the railroad would report it to the Coast Guard. With that the appellant's men at the pier went home and thereafter nothing was done by the appellant about the wreck before the accidents happened as above noted.

The captain of the Allentown knew just where the wreck was, but whoever on the Allentown reported the location to the railroad mistakenly placed it 300 feet south of the pier. The Coast Guard was so informed at 10:55 P. M. and at 11:45 P. M. sent a patrol boat to the location given. There is a conflict in the evidence as to when the patrol boat arrived in that vicinity and, though its log gives it as 12.05 A. M. on November 16th, the judge found on apparently credible evidence, that it was 12:35 A. M. and we accept that finding. At about the same time, and while the patrol boat was searching for the wreck, the tug Ann Marie Tracy, bound for Pier 18 on business, struck it and was damaged. But even then the patrol boat did not learn where the wreck lay. She did not find it before the tug St. Charles hit it at 5:15 A. M., nor until she struck it herself at 5:45 A. M. Even then she didn't mark the wreck and after she had left the vicinity because of some engine trouble the tug Osprey struck the wreck at 8:30 A. M. The Coast Guard did mark the wreck eventually but not until about ten o'clock that morning.

Under these circumstances, it is apparent that the appellant has not shown that the railroad was negligent in loading the barge without first inspecting it with the requisite care to determine whether the plank was sprung before loading. Nor has it shown that the plank was sprung while the barge was at the pier during loading or afterwards. So the dismissal of the appellant's libel against the railroad was not erroneous.

█ Moreover the wreck statute referred to previously casts upon the owner the duty to mark the wreck "immediately.". This is a non-delegable duty which must be performed not immediately in the literal sense of that word but within a reasonable time. The Anna M. Fahy, 2 Cir., 153 F.

866; The Macy, 2 Cir., 170 F. 930; Red Star Towing & Transportation Co. v. Woodburn, 2 Cir., 18 F.2d 77. It is a matter of public policy reflected in the statute to place the responsibility for marking the wreck squarely upon the owner alone. The R. J. Moran, 2 Cir., 299 F. 500, 503. This appellant, who was the owner, did nothing in that regard although as early as two hours before the first accident at the wreck its general foreman Nelson had notice the barge had sunk in the navigable channel. In the absence of evidence showing that Nelson couldn't reasonable have had time to have the wreck marked before the vessels struck it, we accept the trial judge's holding that the appellant violated the wreck statute as to all of them. We also accept the holding that this violation was with the personal knowledge and privity of the owner, so as to deprive it of the right to limit liability.[2] The general foreman Nelson had personal knowledge and his knowledge was as a matter of law that of the corporate appellant. Eastern S. S. Corp. v. Great Lakes Dredge & Dock Co., 1 Cir., 256 F. 497.

■ Nor do the unsuccessful efforts of the Coast Guard to locate and mark the wreck affect this liability. It has long been the law that an owner may comply with the statutory requirement for marking by getting the Lighthouse Department (now the Coast Guard) to do it; when the Coast Guard does mark the wreck, whether properly or not, the owner is relieved of any statutory duty in that respect. The Plymouth, 2 Cir., 225 F. 483, certiorari denied, 241 U.S. 675, 36 S.Ct. 725, 60 L.Ed. 1232; New York Marine Co. v. Mulligan, 2 Cir., 31 F.2d 532; City of Taunton-Sunken Wreck, D.C.S.D.N.Y., 11 F.2d 285, 1927 A.M.C. 135; The Barge Chambers, D.C.S.D.N.Y., 98 F. 194, 1924 A.M.C. 572; Wilson v. Mitsui & Co., D.C.N.D. Cal., 27 F.2d 185. The basis of this exception to the otherwise non-delegable duty is the fact that the private owner cannot interfere with the manner in which the government agency uses its discretion in the manner of marking. The Plymouth, supra. Although the Coast Guard's search for the wreck may, if made with due diligence in the light of the facts within the knowledge of the owner, operate to discharge the owner's duty, the mere fact that the Coast Guard undertakes a search does not relieve the owner of liability for failure to make all reasonable efforts to mark. The Snug Harbor, 4 Cir., 40 F.2d 27. The dicta in Petition of Anthony O'Boyle, Inc., 2 Cir., 161 F.2d 966, 967, and Red Star Towing & Transportation Co. v. Woodburn, 2 Cir., 18 F.2d 77, 79, which may indicate the contrary should be discounted accordingly. Nor is it of any moment that the appellant's liability to mark ceased when the Coast Guard finally did mark the wreck, for by then all the damage had occurred. It follows that the barge owner was correctly held guilty of violating the wreck statute and liable for the damages caused the vessels which hit the wreck before it was marked.

One of the tugs, the Ann Marie Tracy, struck the wreck while going on business to the railroad's pier. As the railroad had knowledge of the wreck and its location, it may well be that regardless of the wreck statute it was under an obligation to use due care by patrolling, marking, or otherwise giving such a vessel suitable warning to enable it to get to the pier safely. Thames Towboat Co. v. Fields, D.C.S.D. N.Y., 287 F. 155, affirmed 2 Cir., 25 F.2d 1023; Cornell Steamboat Co. v. Robert Gladstone, Jr., Inc., D.C.S.D.N.Y., 8 F. Supp. 431. But the owner of that tug has not sought to enforce any such liability and we will not undertake, absent that, to decide whether the railroad is secondarily liable. Very likely as a practical matter it is of no importance.

The other vessels which were damaged by hitting the wreck were not bound for Pier 18 and to them the railroad owed no duty.

Decree affirmed.

FRANK, Circuit Judge (dissenting in part).

2. 46 U.S.C.A. § 183.

I agree as to the liability of libellant. I dissent because I think the railroad (i. e., the railroad trustees) should be held liable over, by way of indemnity, to libellant. The wreck statute imposed a non-delegable duty on libellant to mark the wreck. But I think the tug Allentown, owned by the railroad, by not discharging its duty to libellant, caused libellant to be liable to the vessels injured by the unmarked wreck.

The tug undertook to tow the barge and therefore assumed obligations to the barge. That it did so gratuitously is not material;[1] especially is this so, because the railroad had a selfish reason for wanting the barge moved in order to have its dock clear. I think that, in two ways, the tug violated its duty to the barge:

(1) When the barge was wrecked, the tug could not properly, in discharge of its duty to libellant, leave the wreck without marking it. The tug did attempt to mark it, by attaching a lantern to the flag pole; but as the tug soon discovered, this attempt failed, when the false roof floated away. (2) The tug then gave incorrect information about the wreck's location to representatives of the railroad, and told libellant's foreman that the railroad would report the wreck to the Coast Guard. The misinformation caused the Coast Guard to delay in finding and marking the wreck. During this delay, the other vessels were damaged by the wreck. Had correct information been given to the Coast Guard, doubtless it would have marked the wreck before that damage occurred. Because of either or both (1) and (2), the railroad, I think, is liable over to libellant.

Of course, libellant's liability to the other vessels is not lessened on that account. But if A is held liable for breach of a non-delegable duty—statutory or otherwise—A is entitled to indemnity from C, if C's conduct caused that breach, and if C's conduct was a violation of a duty (by the route of contract or tort) which C owed to A. Burris v. American Chicle Co., 2 Cir., 120 F.2d 218, 222; Restatement of Restitution, §§ 94, 95.

Libellant pleaded that the railroad was liable for the conduct of the Allentown (a) in failing to mark the wreck, or to stand by, until the Coast Guard took charge, and (b) in failing promptly to notify the Coast Guard of the exact location of the wreck. The pleading contained a prayer for "further and other relief." Thus the pleading sufficed to include the railroad's liability over to libellant.

---

**1.** The Deer, D.C.S.D.N.Y., 7 Fed.Cas. at page 352, No. 3,737; King v. Red Star Towing & Transportation Co., D.C.E.D. N.Y., 48 F.2d 633, 634; cf. Harper, Law of Torts, 220 et seq.; Corbin, Contracts, I, 683–686.