312 F.2d 78
 MORANIA BARGE NO. 140, INC., as owner of the TANK BARGE MORANIA NO. 140, Libellant-Appellee,
v.
M. & J. TRACY, INC., Respondent-Appellant,
Reading Company and TUG POTTSVILLE, Respondent-Impleaded,
Penn No. 8, Inc. and TUG MORANIA No. 8, Respondent-Impleaded,
Sinclair Refining Company Petroleum Tankers, Inc., and Tanker P. W. THIRTLE, Respondents-Impleaded.
 No. 129.
 Docket 27710.
 United States Court of Appeals Second Circuit.
 Argued November 15, 1962.
 Decided December 26, 1962.
 
 Platow & Lyon, New York City (Lawrence M. Honig, New York City, of counsel), for libellant-appellee and for respondent-impleaded Penn No. 8 and Tug Morania No. 8.
 Frank G. Colgan, Brooklyn, N. Y., for respondent M. & J. Tracy, Inc.
 James A. Leonard, New York City, for appellant.
 Before LUMBARD, Chief Judge, and SWAN and WATERMAN, Circuit Judges.
 WATERMAN, Circuit Judge.
 
 
 1
 This is an appeal from an interlocutory decree in the admiralty holding appellant, M. & J. Tracy, Inc., liable for damages sustained by libellant's tank barge, Morania No. 140, when it fetched up on a sunken coal barge owned by Tracy. Liability was predicated upon Tracy's alleged negligence in failing to mark its sunken barge, Cape Erwin, as required by 33 U.S.C. § 409. Various impleading petitions were served, but all of these actions have been dismissed and none is involved in the present appeal.
 
 
 2
 The record on appeal contains little more than the pleadings, as amplified by answers which Tracy made to interrogatories filed by the libellant, and a stipulation as to uncontested facts. No witnesses were called, and Tracy offered no evidence at trial. The sole question presented is whether the libellant, Morania Barge No. 140, Inc., established a prima facie case of negligence on the part of Tracy sufficient to support the decree of the trial court. We hold that such a prima facie case was established and therefore we affirm the decree below.
 
 
 3
 The facts, as stipulated by the parties, were as follows:
 
 
 4
 "At approximately 1300 hours of February 27, 1958, a collision occurred between the tanker P. W. Thirtle and the loaded coal barge Cape Erwin in the navigable channel of the Arthur Kill south of the Goethals Bridge. * * * The Cape Erwin was owned by M & J Tracy, Inc.
 
 
 5
 "Approximately five to 10 minutes after the collision the Cape Erwin sank in the navigable waters of the channel. When the Cape Erwin sank she submerged completely under the surface of the water.
 
 
 6
 "It is further stipulated * * * that after the Cape Erwin had sunk, the Morania Barge No. 140, while in tow of the tug Morania No. 8 fetched up and stranded on the Cape Erwin. At the time the Morania No. 140 fetched up on the sunken Cape Erwin, no wreck marker or wreck buoy had been placed on the site."
 
 
 7
 The libellant alleged that the collision between Morania No. 140 and the submerged Cape Erwin occurred shortly after 2:30 P.M. on February 27. Tracy's answer to the libel fixed the time at shortly after 3:30 P.M. The interval of time between the sinking of the Cape Erwin and the collision here at issue, therefore, was from one hour and twenty minutes, as found by the trial court, to approximately two hours and one half, as admitted in appellant's pleadings.
 
 
 8
 Although 33 U.S.C. § 409 is a criminal statute, it reflects a legislative judgment of the standard of care to which owners of sunken vessels should be held in civil actions. Sullivan v. P. Sanford Ross, 263 F. 348 (2 Cir., 1920). The statute provides as follows:
 
 
 9
 "* * * And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; * * *."
 
 
 10
 If the statute were interpreted literally, it would be undeniable that Tracy was in violation of its provisions because of failure to mark the Cape Erwin after its sinking in a navigable channel. From such a statutory violation, Tracy's negligence in causing the subsequent collision of Morania No. 140 with the wreck would be presumed. Sullivan v. P. Sanford Ross, supra; Reading Co. v. Pope & Talbot, Inc., 192 F.Supp. 663 (E.D. Pa.), aff'd 295 F.2d 40 (3 Cir., 1961). Section 409 has not been interpreted literally, however. Although it has been described as a "drastic statute," The Chambers, 298 F. 194, 196 (S.D.N.Y. 1924), aff'd Director General of Railroads v. Molyneaux, 13 F.2d 1021 (2 Cir., 1926), and one which imposes a "very high degree of care * * * upon the owners of wrecks," Sullivan v. P. Sanford Ross, Inc., supra 263 F. at 350 (dissenting opinion), the courts have found no violation of its provisions where owners have taken steps to mark their sunken vessels within a reasonable time after receiving notice of the sinking. Petition of Anthony O'Boyle, Inc., 161 F.2d 966 (2 Cir., 1947); The Anna M. Fahy, 153 F. 866 (2 Cir., 1907).
 
 
 11
 From these authorities, appellant argues that to establish a prima facie case of dereliction of statutory duty under § 409, a libellant must affirmatively plead and prove, in the first instance, the failure of the owner to mark a sunken vessel (1) within a reasonable time (2) after he has received notice of the sinking. Although appellant in this case admittedly received notice of the sinking of its barge, no evidence has been offered as to the time the notice was received. Libellant failed, thus, to establish, it is contended, that Tracy neglected to mark the wreck within a reasonable time after the notice was received.
 
 
 12
 There have been brought to our attention, however, no cases in which so heavy a burden of going forward with the evidence was imposed upon a libellant claiming negligence for failure to comply with § 409. Indeed, our decision in Berwind-White Coal Mining Co. v. Pitney, 187 F.2d 665 (2 Cir., 1951) suggests a different allocation of the burden of proof. There, the first of several ships collided with appellant's wrecked coal barge approximately two and one half hours after the barge sank in a navigable channel. In holding the barge owner at fault for failure to mark the wreck, we said:
 
 
 13
 "This appellant, who was the owner, did nothing in that regard although as early as two hours before the first accident at the wreck its general foreman Nelson had notice the barge had sunk in the navigable channel. In the absence of evidence showing that Nelson couldn't reasonable [sic] have had time to have the wreck marked before the vessels struck it, we accept the trial judge's holding that the appellant violated the wreck statute as to all of them." 187 F.2d at 669.
 
 
 14
 In The Chambers, 298 F. 194 (S.D.N.Y. 1924), aff'd Director General of Railroads v. Molyneaux, 13 F.2d 1021 (2 Cir., 1926), respondent's sunken vessel had been marked some days prior to the collision of another vessel with it. At the time of the collision, however, the wreck was not buoyed, for the marker had unexplainedly carried away prior to the accident. In holding the owner of the wreck liable for the resulting damages, Learned Hand, J., then sitting in the District Court, stated:
 
 
 15
 "The statute [33 U.S.C. § 409] imposes a continuous duty and I think that an owner should show why he did not watch the buoy, what efforts he made, and what prevented him, when it carried away, from substituting a new one." 298 F. 195.
 
 
 16
 The heavy burden of going forward with the evidence which appellant asks us to impose on libellant here finds no more support in reason than it does in authority. In its answer to the libel, Tracy admitted to having received notice of the sinking of the Cape Erwin. The barge sank in a heavily traveled channel, the Arthur Kill, but a few miles from appellant's place of business in New York City. Whether the notice reached Tracy immediately or some time after the sinking, whether employees of Tracy were available and had the implements at hand to mark the wreck, and whether Tracy took steps to impress these or other agents into service for purposes of complying with § 409 are all matters peculiarly within the knowledge of Tracy. Under these circumstances, once a substantial delay in placing suitable markers has been proved, the owner should have the burden of going forward with evidence to establish the discharge of his statutory duty to mark his sunken vessel. The masters of vessels plying navigable channels should be free to assume that the channel is clear of sunken vessels unless markers are present as required by law.
 
 
 17
 Although the appellant-respondent offered no evidence at trial, Tracy now relies upon certain allegations or "admissions" in the pleadings and in Tracy's answers to interrogatories, propounded and introduced into evidence by the libellant, to show that (1) Tracy made some efforts to have the Cape Erwin marked prior to the collision here at issue, and (2) Morania was at fault in failing to heed warnings prior to the collision. An examination of the record before us reveals no evidence on these issues helpful to appellant's position.[1]
 
 
 18
 As part of its libel, Morania Barge No. 140, Inc., alleged:
 
 
 19
 "Fifth: That on February 27, 1958, at about 1:00 P.M., E.S.T., at the Calso Dock at Perth Amboy, New Jersey, * * * the tankbarge `Morania No. 140' was taken in tow by the tug `Morania No. 8' bound for 30th Street and the East River via Arthur Kill and the Kill Van Kull. * * *
 
 
 20
 "The voyage proceeded without incident until about 2:30 P.M., E.S. T., as the flotilla then in mid-channel approached the Goethal's Bridge, spanning the Arthur Kill, when, as the flotilla rounded the bend to starboard in the Gulf Port reach of the Kill, several craft were observed tied up and at rest on the starboard bank above the dock, where some work was in progess. Among the craft there, were two tugs, two barges and the U. S. Coast Guard crash boat with an `A' frame derrick working inshore. These craft, abreast of each other, extended into the channel to about the same distance as the face of the dock, slightly to the south, and in no way obstructed or impeded navigation in the channel. As the flotilla came about abreast of these craft, one of the tugs flashed his white searchlight several times and someone shouted. The motors of the tug `Morania No. 8' were immediately stopped to hear what was shouted and the flotilla drifted in the tide in mid-channel making about five miles per hour over the ground. A man on the craft at the bank pointed towards the bridge, but there was nothing ahead to be seen in the channel. Moreover, the motors of the `Morania No. 8' were then reversed and the headway of the flotilla almost stopped when the tankbarge `Morania No. 140' fetched up on a submerged and unmarked object (subsequently found to be the sunken, laden coal barge `Cape Erwin') and became impinged on that object."
 
 
 21
 The admissions in pleadings are to be construed together with the remainder of their content and are to be given effect subject to what qualifications there may be contained therein. Baker, Carver & Morrell Ship Supplies, Inc. v. Mathiasen Shipping Co., Inc., 140 F.2d 522 (2 Cir., 1944). Morania has not admitted that any craft was patrolling the channel or was present near the sunken Cape Erwin at the time the Morania flotilla rounded the bend in the Gulf Port reach of the Kill. Although some attempts to warn the Morania flotilla were made as it came abreast of several craft arrayed on the starboard bank at the dock of Gulf Port, and the motors of the Morania tug were stopped to determine the reason for the signals, Morania alleges that the warnings came too late to avoid the collision with the submerged Cape Erwin.
 
 
 22
 In its answers to Morania's interrogatories, placed in evidence by the libellant, Tracy does not claim that the channel was being patrolled as the Morania flotilla rounded the bend at Gulf Port. Tracy does allege, however, that prior to the time Morania No. 140 fetched up on the submerged Cape Erwin, the tug Pottsville blew alarms from the vicinity of the Gulf Port Dock and the United States Coast Guard picket boat No. 4066 "had proceeded down stream to the Morania No. 8 and had run parallel with her giving warning of the sunken barge."
 
 
 23
 On this record we find no error in the trial court's determination that Morania was not at fault in the subsequent collision with the sunken Cape Erwin. In The E. M. Millard, 285 F. 94 (S.D.N.Y. 1922) a similar defense to liability was based upon warnings given to the libellant's vessel as it approached a submerged wreck. Finding respondent liable notwithstanding the attempted warnings, the court stated:
 
 
 24
 "There is some suggestion that a man on the dock waved and shouted a warning to the Millard, but there is no proof that the warning, if given, was heard or seen, and there is no duty upon a tug captain to look for a warning from such a direction in connection with a danger to navigation which should have been properly buoyed." 285 F. at 95.
 
 
 25
 The language of the Supreme Court in The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 216, 37 L.Ed. 84 (1893) is also pertinent:
 
 
 26
 "Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor."
 
 
 27
 And see Reading Company v. Pope & Talbot, Inc., 192 F.Supp. 663 (E.D.Pa.); aff'd 295 F.2d 40 (3 Cir., 1961).
 
 
 28
 Moreover, evidence of third party attempts to warn the Morania flotilla prior to the collision does not explain Tracy's failure to mark its wrecked barge. There is no evidence on the record before us that Tracy in any way instigated, or was connected with, or responsible for, these attempted warnings. Furthermore, even if it were established that Tracy had requested the Coast Guard to patrol or mark the sunken barge, such a request would not discharge Tracy's non-delegable, statutory duty to mark the wreck. Berwind-White Coal Mining Co. v. Pitney, 187 F.2d 665 (2 Cir., 1951).
 
 
 29
 Morania having established a prima facie case of negligence for failure to mark the sunken Cape Erwin, and Tracy having offered no evidence to explain its delay in performing its statutory duty, the decree of the trial court must be, and is, affirmed.
 
 
 
 Notes:
 
 
 [1]
 We need not determine, therefore, whether answers, served in response to interrogatories and entered into evidence by an opposing party, are either self-proving or "binding" upon their proponent in admiralty proceedings. Insofar as such answers contain admissions useful to the opposing party, of course they are to be treated as part of the pleadings and no further proof is required to establish the admitted facts. Baker, Carver & Morrell Ship Supplies, Inc. v. Mathiasen Shipping Co., Inc., 140 F.2d 522 (2 Cir., 1941); The Serapis, 37 F. 436 (S.D. N.Y.1889)
 
 
 
 30
 SWAN, Circuit Judge (dissenting).
 
 
 31
 The Wreck Statute, if read literally, would require the owner of a craft sunk in a navigable channel "to immediately mark it" in the manner specified, but, as the majority opinion points out with citation of authorities, the courts have construed the statute not to be violated if the owner marks his sunken vessel within a reasonable time after receiving notice of the sinking. The trial court found that the Cape Erwin sank within ten minutes after 1 p. m. and that libellant's barge fetched up on it at 2:30 p. m.[1] Judge Clancy also found as a fact that at what hour Tracy learned of the sinking of the Cape Erwin does not appear.
 
 
 32
 The court says that Tracy's answer, filed on June 9, 1959, which was nearly nine months after February 27, 1958, is an admission that Tracy received notice of the sinking. But it is no evidence whatever as to the time notice was received. Without such evidence I fail to see how it can be held that failure to mark the wreck before 2:30 p. m. was proof of an unreasonable "delay" in marking it.
 
 
 33
 My brothers affirm the interlocutory decree on the theory that "once a substantial delay in placing suitable markers has been proved, the owner should have the burden of going forward with evidence to establish the discharge of his statutory duty to mark his sunken vessel." This seems to me a wide departure from the admitted rule that the statutory duty is violated only when the owner fails to mark his sunken vessel within a reasonable time after receiving notice of the sinking. It presupposes the period of an hour and twenty minutes was so substantial a "delay" as to be unreasonable, without any proof as to when in fact the owner received notice of the sinking. With this assumption I disagree. The libellant had to prove that its barge was damaged by Tracy's negligence. Without any proof as to when Tracy received notice of the sinking I do not think that a prima facie case of negligence was established.
 
 
 34
 My brothers cite two cases in support of the contention that Tracy should have the burden of going forward with evidence as to when it received notice of the sinking of the Cape Erwin. Neither of them is in point in my opinion. The first is Berwind-White Coal Mining Co. v. Pitney, 2 Cir., 187 F.2d 665. In this case, the appellant's barge became a wreck in a navigable channel at about 10 p. m. Before the barge was marked several vessels struck the wreck, the first at about 12:35 a. m. The opinion states, at p. 669, "as early as two hours before the first accident at the wreck [the owner's] general foreman Nelson had notice that the barge had sunk in the navigable channel. In the absence of evidence that Nelson couldn't reasonable [sic] have had time to have the wreck marked before the vessels struck it, we accept the trial judge's holding that the appellant violated the wreck statute as to all of them." It will be observed that in that case the owner, through Nelson, did have notice two hours before the first accident, and it was held that Nelson's knowledge was as a matter of law that of the corporate appellant. No such situation exists with respect to Tracy.
 
 
 35
 The second case cited by my brothers, The Chambers, 298 F. 194 (S.D.N.Y.) aff'd, sub nom. Director General of Railroads v. Molyneaux, 2 Cir., 13 F.2d 1021, is also inapposite. In this case the wreck was marked the day after it occurred, so obviously the owner had notice of the wreck. Thereafter the buoy carried away, and a new one was not substituted, the owner not having kept a constant watch over the wreck, after it was once marked. All that District Judge Hand's opinion holds, 298 F. at 195 is that the statute "imposes a continuous duty" and that the "owner should show why he did not watch the buoy, what efforts he made, and what prevented him, when it carried away, from substituting a new one. The respondent did not do any of these things; * * *."
 
 
 36
 For the foregoing reasons it appears to me that libellant failed to prove a prima facie case of negligence and that the interlocutory decree should be reversed.
 
 
 
 Notes:
 
 
 [1]
 Tracy's answer to Interrogatory No. 6 admits that the time was "approximately 1430," i. e. 2:30 p. m