MARINE TOWING, INC., Plaintiff,

v.

RED STAR TOWING AND TRANSPORTATION CO., Defendant and Third Party Plaintiff,

v.

UNITED STATES of America, Third Party Defendant.

No. 71–C–189.

United States District Court, E. D. New York.

July 25, 1973.

**620**

Herbert B. Holberg, New York City (Krisel, Beck & Holbert, New York City), for plaintiff.

Stephen J. Buckley, New York City (McHugh, Heckman, Smith & Leonard, New York City), for defendant and third party plaintiff.

Philip A. Berns, Asst. U. S. Atty., Brooklyn, N. Y. (Robert A. Morse, U. S. Atty. E.D.N.Y., Brooklyn, N. Y.; Gilbert S. Fleicher, Attorney in Charge, Admiralty and Shipping Section, U. S. Dept. of Justice, New York City), for third party defendant.

MOORE, Circuit Judge, Sitting by Designation.

In this admiralty action plaintiff, Marine Towing, Inc., owner of the Tug EVELYN, seeks recovery for damages suffered by the EVELYN when it struck the wreck of the Tug OCEAN QUEEN, owned and operated by defendant Red Star Towing and Transportation Co. (Red Star). Pursuant to Rule 14(c), F.R.Civ.P., Red Star filed a third party complaint against the United States, alleging negligence on the part of the United States Coast Guard in failing to mark the wreck properly. Jurisdiction over the United States under the Public Vessels Act, 46 U.S.C. § 781 et seq. is not contested. By agreement of the parties trial was limited solely to the issue of liability.

### I. Background of the Case

The Hell Gate area of New York Harbor lies between Astoria, Queens, and the Upper East Side of Manhattan, where the waters of Long Island Sound meet the East and Harlem Rivers. In this area, where tidal currents are treacherous and marine activity not inconsiderable, on March 12, 1969, a collision occurred between the oil barge THE FOUR LAKES, and the Tug OCEAN QUEEN. As a result of this incident the OCEAN QUEEN sank in the middle of the channel at approximately 3:25 P.M.

At 3:00 P.M. on the same afternoon the Tug EVELYN had arrived at a Gulf Oil Company facility in Westchester Creek, Bronx, New York, with a loaded petroleum barge, the AMY B in tow. During the time the barge was discharging its cargo, the captain of the EVELYN, Lester Thompson, learned that the OCEAN QUEEN had sunk. Captain Thompson testified that he had heard the location of the wreck described as "at the foot of East 90th Street", and that he had no reason to believe that the wreck was in the middle of the channel at the Hell Gate. (Transcript 16, 17, 32).*

---

* Transcript hereinafter cited as "Tr.".

At 8:30 P.M. that same evening, the EVELYN left the Gulf Oil facility in Westchester Creek and headed for Port Reading, New Jersey, with the now empty barge AMY B in front of the EVELYN in a "push-tow" configuration. Although these statements are challenged by defendants, Captain Thompson, his brother Richard Thompson, deckhand on the EVELYN, and the barge captain, Richard Booth, each testified that Captain Thompson had ordered both the deckhand and the barge captain to serve as lookouts on the bow of the AMY B so that the EVELYN would not hit the wreck of the OCEAN QUEEN. Captain Thompson and his brother testified that as the EVELYN proceeded through the Hell Gate, they observed a Coast Guard buoy tender tied up to a pier at Mill Rock (out of the regularly traveled channel) and a Coast Guard patrol boat tied up about 300 yards from the buoy tender at a Fire Boat Station located at the foot of East 90th Street. (Tr. 20, 117; plaintiff's exhibit 2). Captain Thompson concluded that the wreck of the OCEAN QUEEN was in the vicinity of these vessels near the Manhattan shore and signalled for the deckhand to return from the barge to the tug. Less than a minute after so signalling, and while the barge captain was allegedly still serving as lookout, the EVELYN struck the wreck of the OCEAN QUEEN. No damage to the EVELYN was detected at that time. It was later learned that the EVELYN had been damaged, and this suit, seeking to recover $20,000 from Red Star, was subsequently commenced.

## II. The Liability of Red Star

Plaintiff asserts that defendant Red Star was under a statutory duty to mark the site of the wreck of the OCEAN QUEEN and that, since the site was not so marked, Red Star is liable for the damage suffered by the EVELYN.

Section 409 of Title 33 of the United States Code (the Wreck Statute) provides:

> * * * And whenever a vessel, raft or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; * * *

Red Star does not contend that the statute was not applicable to the wreck of the OCEAN QUEEN. Rather, Red Star argues (1) that the Coast Guard had assumed responsibility for marking the wreck, thus relieving Red Star of its obligations under the statute, and (2) that the wreck was in fact marked as required by the statute.

At approximately 5:30 P.M., the Tug PORT JEFFERSON, another Red Star tug which had come on the scene after learning of the collision, received a radio message from the Red Star dispatcher requesting that the tug attempt to mark the site of the wreck with a lantern. The captain of the JEFFERSON testified that he prepared two lanterns to hang on the mast of the OCEAN QUEEN. (Tr. 193). Because of the tidal currents in the area, the captain did not believe that his tug could safely hang these lanterns without risking hitting the OCEAN QUEEN and perhaps knocking it over or otherwise dislodging it from its position on the bottom of the channel. A small Coast Guard boat then came alongside to assist the PORT JEFFERSON, took the lanterns, and hung one of them on the mast of the OCEAN QUEEN. After dark, the PORT JEFFERSON made a wide circle around the lantern and determined that it was visible from all directions. (Tr. 193–96). The PORT JEFFERSON remained in the area until about 8:00 P.M. It then left with the knowledge that a Coast Guard buoy tender was due to arrive at any moment to place a large wreck buoy over the OCEAN QUEEN. (Tr. 197).

Red Star cites the following excerpt from Berwind-White Coal Mining Co. v. Pitney, 187 F.2d 665 (2d Cir. 1951),

to support its argument that at the time the EVELYN struck the wreck it had no liability under the Wreck Statute:

> It has long been the law that an owner may comply with the statutory requirement for marking [a wreck] by getting the [Coast Guard] to do it; when the Coast Guard does mark the wreck, whether properly or not, the owner is relieved of any statutory duty in that respect.

187 F.2d at 669. *See, also,* The Plymouth, 225 F. 483, 485 (2d Cir. 1915), cert. denied, 241 U.S. 675, 36 S.Ct. 725, 60 L.Ed. 1232 (1916).

In this case, however, the Coast Guard was not able to get its wreck buoy into place above the wreck of the OCEAN QUEEN until 10:30 P.M. that evening (Tr. 47a); the EVELYN struck the OCEAN QUEEN at about 9:30 P.M. Red Star argues that since the Coast Guard had marked the location of the wreck by hanging a red flag from its mast (which protruded slightly above the surface of the water) within a few minutes of the sinking and had then assisted the JEFFERSON in hanging the lantern on the mast and since it had also directed marine traffic around the wreck by use of its radio, the Coast Guard assumed responsibility for marking the wreck and had thereby relieved Red Star of its statutory obligations.

■ In this Red Star is mistaken. The Wreck Statute clearly states that the owner of a wreck is obliged to "mark [its wreck] * * * and to *maintain* such marks until the sunken craft is removed * * *." (33 U.S.C. § 409, emphasis added). The cases in this Circuit have so interpreted this language as to impose "a continuous duty" upon the owner to "watch the buoy," The Chambers, 298 F. 194, 195 (S.D.N.Y.1924), *aff'd* 13 F.2d 1021 (2d Cir. 1926), and to "patrol" the area of the wreck, Morania Barge No. 140, Inc. v. M. & J. Tracy, Inc., 312 F.2d 78, 82 (2d Cir. 1962). This duty to "maintain such marks" (33 U.S.C. § 409) is obviously not an everlasting one, but terminates

once the Coast Guard has actually marked the wreck with its own buoy. Berwind-White, *supra,* 187 F.2d at 669; The Plymouth, *supra,* 225 F. at 485. The fact that here the Coast Guard had placed a flag on the mast of the OCEAN QUEEN shortly after it had sunk, had assisted the PORT JEFFERSON in hanging the lantern, and had stationed a vessel in the area to monitor the radio channel used by mariners for bridge-to-bridge communications in order to direct vessels in the area around the wreck does not mean that the Coast Guard had marked, or had assumed responsibility for marking, the wreck so that Red Star was under no further obligation under the Wreck Statute.

■ The Hell Gate area is one of strong tidal currents and heavy marine traffic. The captain of the PORT JEFFERSON well knew that the OCEAN QUEEN might be precariously balanced on the channel bottom, since he testified that he had not wanted to place a lantern on the OCEAN QUEEN's mast from his tug for fear of knocking over the wreck. Tides, currents, traffic, or the settling of the wreck itself could have caused the OCEAN QUEEN at any time to shift its position in such a way that the mast, with its lantern, would no longer have been visible. Given this obviously temporary marking of the wreck and the clear command of Section 409, I conclude that the Coast Guard had not relieved Red Star of its duties under the statute and that Red Star violated that statute by failing to keep a watch on the buoy until the Coast Guard had marked the wreck with its more permanent buoy.

■ The Wreck Statute has been described as a "drastic" one, The Chambers, *supra,* 298 F. at 196, Morania Barge No. 140, *supra,* 312 F.2d at 80, and the standard of care it imposes upon owners of wrecks is very high. The policy behind the statute is obvious and one which clearly merits strict performance of the duties imposed:

> The masters of vessels plying navigable channels should be free to assume that

the channel is clear of sunken vessels unless markers are present as required by law.

Morania Barge No. 140, *supra,* 312 F.2d at 81.

In view of the above I conclude that Red Star clearly violated its duties under the Wreck Statute.

III.   The Liability of the Tug EVELYN

Section 221 of Title 33 of the United States Code provides:

Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect * * * to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

Since the EVELYN claims to have had knowledge of the sinking of the OCEAN QUEEN, the applicability of Section 221 may not be disputed.   Surely the loss of the OCEAN QUEEN was a special circumstance requiring that the EVELYN maintain a lookout while passing through the area of the wreck.   Of course the EVELYN claims to have maintained such a lookout, and perhaps she did, although the gradual development of that story is suspect.[1]

I do not believe that the determination of liability in this case turns on whether the EVELYN had proper lookouts on the barge.   In the circumstances of this case I believe that the EVELYN was under a further duty to inquire as to the location of the wreck.   It is not enough that Captain Thompson assumed the wreck was at the foot of East 90th Street because he had heard that that was its location.   Nor was it enough that he asked his office to find out where the wreck was and never received a reply.   Captain

Thompson testified that he had a working radio which was tuned to channel 13, the bridge-to-bridge frequency designed to be used to prevent collisions.   The Coast Guard vessel in charge of the rescue of the crew members of the OCEAN QUEEN monitored channel 13 from late afternoon until after the EVELYN had struck the wreck.   (Tr. 39A, 53A–56A).   In addition to broadcasting warnings as to the existence of the wreck, none of which Captain Thompson heard, this Coast Guard vessel "directed traffic" around the wreck.   (Tr. 40A).

Captain Thompson testified that he made a normal security broadcast on entering Hell Gate, announcing that he was proceeding through the area.   He stated that he heard no response from the Coast Guard.   (Tr. 39).   But Captain Thompson made no direct effort to contact the Coast Guard on either channel 13 or channel 16, an emergency frequency, to learn the location of the OCEAN QUEEN.   He testified that after making his security broadcast on channel 13, and not receiving any reply, he simply monitored that frequency.   He did this despite the fact that he knew that the Coast Guard would be monitoring both channels 13 and 16, that the wreck of the OCEAN QUEEN was in the general area of the Hell Gate (even though he considered the foot of East 90th Street not to be within the Hell Gate proper), and that he actually saw Coast Guard vessels in the Hell Gate vicinity before his tug struck the wreck.   To require that the master of a vessel in the situation of the EVELYN inquire of the Coast Guard as to the location of a wreck which had sunk only six hours before, when the Coast Guard was on the scene and apparently capable of providing this information, is not to ask very much.   In the T. J. Hooper, 60 F.2d 737 (2d Cir.), cert. denied, 287 U.S. 662,

---

1.   At a Coast Guard hearing in 1969, Captain Thompson said that his crew was "down below" when the EVELYN struck the OCEAN QUEEN.   He later stated that by this he meant simply "below" the raised pilot house in which he stood.   To bolster Captain Thompson's story, deckhand Thompson subsequently submitted a five-page letter to the

Coast Guard in which he asserted that he had been on lookout that night.   In that statement he made no mention of the fact that the barge captain had also been on lookout with him.   The barge captain testified at trial that he, too, had been a lookout that night.

53 S.Ct. 220, 77 L.Ed. 571 (1932), Judge Learned Hand held that an oceangoing tug which did not carry a radio capable of receiving weather forecasts was "unseaworthy," 60 F.2d at 740. He did so in the face of proof that only one company had so outfitted its tugs. In this case the EVELYN had a radio fully capable of communicating with the Coast Guard vessel which would most likely have known where the OCEAN QUEEN lay. It would have been no burden at all to have made such an inquiry. I believe that where, as here, potentially grave consequences can be avoided at virtually no cost or inconvenience, it is impossible to avoid the conclusion that such action is a "precaution * * * required by the ordinary practice of seamen, [and] by the special circumstances of the case." (33 U.S.C. § 221). Such inquiry could certainly have given the EVELYN information enough to have avoided the wreck, even if, at that time, it were not marked by a lantern.

In addition, given Captain Thompson's knowledge of the existence of the wreck, I conclude that for him to have brought the EVELYN through the Hell Gate at close to maximum speed when the location of the wreck was not known to him was also negligent. The George H. Jones, 27 F.2d 665, 667 (2d Cir.), cert. denied, 278 U.S. 649, 49 S.Ct. 83, 73 L.Ed. 561 (1928).

As is the case in so many maritime accidents, here there was much conflicting testimony from which many speculative hypotheses explaining how the EVELYN came to strike the OCEAN QUEEN may be drawn.

The Red Star lantern could have gone out; another vessel may have knocked the lantern over, thereby extinguishing it, or the lookouts may not have seen it. These are interesting speculations which need not (and by this Court cannot with any degree of certainty) be resolved.

However, two duties were imposed upon the parties which are clear. Red Star had a statutory obligation to guard the wreck until the Coast Guard had placed its wreck buoy at about 10:30 P.M. The EVELYN, having notice that the wreck had occurred in an area through which it would pass, was under a duty to ascertain its whereabouts and to proceed with caution. I find that each party violated its respective duty.

## IV. Damages

■ The Supreme Court has said:

> The doctrine in admiralty of an equal division of damages in the case of a collision between two vessels, when both are in fault contributing to the collision, has long prevailed in England and in this country.

Belden v. Chase, 150 U.S. 674, 691, 14 S. Ct. 264, 269, 37 L.Ed. 1218 (1893).

A leading authority has said:

> The collision case is rare in which there is not at least some arguable reason for regarding both vessels at fault; * * *.

G. Gilmore & C. Black, The Law of Admiralty, § 7–6 at 408 (1957).

And this approach has also been followed in non-collision cases. W. E. Hedger Transp. Corp. v. United Fruit Co., 198 F.2d 376 (2d Cir.), cert. denied, 344 U.S. 896, 73 S.Ct. 275, 97 L.Ed. 692 (1952); Somerset Seafood Co. v. United States, 193 F.2d 631, 639–640 (4th Cir. 1951); Staring, Contribution and Division of Damages in Admiralty and Maritime Cases, 45 Cal.L.Rev. 304, 316–18 (1957). Here both the EVELYN and Red Star were negligent and the negligence in each case was clearly a "contributing cause" of the damage suffered by the EVELYN. Dow Chemical Co. v. Dixie Carriers, Inc., 463 F.2d 120, 122 (5th Cir. 1972).

I therefore conclude that plaintiff, Marine Towing, Inc., and defendant, Red Star, are each liable for half the damages incurred as a result of the Tug EVELYN's striking the wreck of the OCEAN QUEEN.

It is therefore ordered that these parties each pay one-half of these damages; the United States shall pay nothing. No

interest or costs shall be charged to any party.

Counsel are directed to submit a final Order of Judgment in accordance with this opinion.

This opinion states the Court's findings of fact and conclusions of law in compliance with Rule 52, F.R.Civ.P.