See, also, D.C., 140 F.Supp. 890.

RUSSELL, POLING & COMPANY, Newtown Creek Towing Company and Chester A. Poling, Inc., Plaintiffs,

v.

UNITED STATES of America, Defendant and Third/Fourth Party Plaintiff (CONNERS STANDARD MARINE CORPORATION, Third-Party Defendant, RUSSELL BROTHERS TOWING COMPANY, Inc., Fourth-Party Defendant).

RUSSELL, POLING & COMPANY, Newtown Creek Towing Company and Chester A. Poling, Inc., Libelants,

v.

CONNERS STANDARD MARINE CORPORATION and THE CORPORAL, Respondents,

and

THE RUSSELL POLING NO. 20 and Russell Brothers Towing Co., Inc., Respondents-Impleaded.

United States District Court
S. D. New York.
May 14, 1957.

Alexander, Ash & Schwartz, New York City, Edward Ash, New York City, of counsel, for libelants and plaintiffs.

Paul W. Williams, U. S. Atty., for Southern District of New York, New York City, Walter L. Hopkins, Attorney, Admiralty & Shipping Section, Department of Justice, New York City, of counsel, for defendant and third/fourth party plaintiff.

Purdy, Lamb & Catoggio, New York City, Edmund F. Lamb, New York City, of counsel, for Conners-Standard Marine Corp.

DAWSON, District Judge.

This case concerns damage sustained by the barge Russell-Poling No. 29 at about midnight on December 7, 1954, while being towed northward in the Tremley Point Reach of the Arthur Kill between Staten Island and New Jersey. The bottom of the barge was damaged, apparently because it hit bottom. Liability is asserted against two defendants: (1) the United States is charged with negligence in regard to channel buoys which, it is asserted, were out of position; (2) Conners-Standard Marine Corporation, owner of the tug Corporal, which was towing the barge, is charged with negligent navigation.

## Nature of the Actions

Plaintiffs-libelants (hereinafter referred to as Russell), as owners of the barge Russell-Poling No. 29, brought suit on the civil side of the Court under the Federal Tort Claims Act, alleging that the damage to the barge was caused or contributed to by the fact that Buoys No. 20 and No. 22, marking the easterly side of the channel and under the maintenance and control of the Coast Guard, were out of position and thus lured the tow into shallow waters.

Russell also sued the tug Corporal and her owner, Conners-Standard Marine Corp., in admiralty alleging negligent towage. In the action brought on the civil side of the Court the Government filed third-party complaints against Conners-Standard Marine Corp., as operator of the lead tug Corporal, and against Russell Brothers Towing Co., Inc., as operator of the helper tug Russell No. 20. The claim of the Government with respect to the Corporal is that, among other things, her navigator relied exclusively upon Buoys No. 20 and No. 22 in shaping his course up the channel, although navigators had been cautioned by the Coast Guard and by official publications against exclusive reliance upon floating buoys. The claim of the Government against Russell Brothers Towing Co., Inc. and the helper tug Russell No. 20 was withdrawn.

For trial convenience both actions have been consolidated.

## Facts

The Russell-Poling No. 29 was a 175 foot steel tank barge with drafts of 9' 6" forward and 10' aft. On the evening of December 7, 1954, this barge left Perth Amboy, New Jersey, en route to Haverstraw, New York, up the Arthur Kill between Staten Island and New Jersey, with the tug Corporal towing her on the starboard side. The night was clear with visibility good. The tide was flooding. There was no separate lookout posted on either the barge or the tug Corporal.

Shortly before the incident which gave rise to these actions the tug Russel No. 20 joined the tow as helper tug, being moored to the port side of the barge. Her draft was 10' 6". Under tow of the two tugs the barge proceeded north-

ward in the Tremley Point Reach Channel of the Arthur Kill. The navigation charts for this waterway indicated that the easterly side of the channel was marked by unlighted (reflective) nun buoy 20 and lighted buoy 22.

The tow proceeded without incident until about midnight when it was about 50 feet to 100 feet west of unlighted nun buoy 20 and a slight jar was felt. The tow did not stop but sheered off slightly to port or westward toward New Jersey. No soundings were taken to determine whether the barge was aground or what her position was. Shortly after this jar the barge was seen to be sinking by the bow. Investigation revealed the forward tank to be filling with water. It was decided to beach the barge further north in the Kill and this was done by pushing the barge on to the west bank of the channel. No cargo was lost. The barge was lightened and thereafter removed to drydock where a survey revealed a puncture in the very center of the bow at the foot, where the plates curve under to join the bottom plates of the tank. Several bottom plates, extending about 30 feet aft of the puncture, were apparently pressed in.

The evidence revealed that in the area adjacent to Buoys 20 and 22 dredging operations had been going on for some time. The dredging operations were carried on by contractors working under the direction of the Army Engineers. Buoy 20 had been moved to facilitate dredging operations early in October 1954, but on November 9, 1954, the buoy had been reset in the position designated on chart No. 285 issued by the United States Coast Guard. On July 13, 1954, Buoy 22 had been reserviced and its location in the proper position was certified to at that time by a tender of the United States Coast Guard.

Immediately after the accident the owners of the barge reported that their barge had struck a submerged object in the vicinity of Buoy 20. On the following day the Army Engineers surveyed the area and found no sunken obstruction. They did find, however, that Buoy 20 was approximately 75 yards slightly to the south of east of its charted position. On the next succeeding day, December 9th, the Coast Guard found this same buoy to be 350 yards southwest of its charted position, or about in the middle of the channel, and the buoy was then reset in its charted position by the Coast Guard. On this same day the Coast Guard found Buoy 22 to be off station about 200 feet toward the Staten Island shore.

## Discussion

The claim of the owners of the barge against the Government is based upon the contention that Buoys 20 and 22 were off their charted position at the time of the accident. The proper position of these buoys was shown on charts issued by the United States Coast Guard to indicate the boundary of the main channel. Charts put in evidence indicated that these buoys marked the shallow water toward the Staten Island shore. Testimony indicated that the bottom in this position was rocky. The buoys were therefore an indication to navigators that vessels should keep to the west of the buoys and thereby avoid the shallow bottom of the channel toward the Staten Island side. The Government recognizes that the buoys were found off their charted position on the day following the accident. The Government contends that this fact, however, does not establish that the buoys were off position at the time of the accident.

The evidence reveals that fourteen hours after the accident Buoy 20 was 75 yards south of east from its charted position and that one day thereafter it was 350 yards northwest. Buoy 22 was also observed to be wide. Despite this apparent drifting each buoy, when repositioned, was found to be still attached to its chain and anchor weighing several tons. What caused these buoys to move and drag their mooring is conjectural. However, the primary evidence on this matter did indicate that such movement is often caused by tugs whose tow lines foul the chain of the buoy which is then dragged off position.

The inference is strong that Buoy 20 and Buoy 22 were out of position to a significant extent at the time of the accident. While there is no direct proof of this fact, the interval between the collision and the subsequent location of the buoys off position was short enough to provide a basis for inferring that neither buoy was in its charted location at the time of the accident. Also relevant is that the tow passed 50 to 100 feet west of Buoy 20. In this position the barge would have been in deep water if the buoy were in its proper position. Although it is difficult to reconstruct the facts surrounding this casualty, the evidence sustains the conclusion, and the Court so finds, that Buoy 20 was sufficiently off position at the time of the accident to lure the tow into shallow water.

The liability of the United States is predicated upon the Federal Tort Claims Act whose relevant provisions are 28 U.S.C. §§ 1346(b), 2674, and 2680(a):

§ 1346(b). "* * * the district courts * * * shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

§ 2674. "The United States shall be liable * * * in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."

§ 2680. "The provisions of this chapter and section 1346(b) of this title shall not apply to—

"(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

In Indian Towing Co. v. United States, 1955, 350 U.S. 61, 76 S.Ct. 122, 100 L. Ed. 48, recovery was sought under the Tort Claims Act for damages alleged to have been caused by the negligence of the Coast Guard in the operation of a lighthouse. It was alleged that the Coast Guard maintained this lighthouse, that it negligently failed to check the battery and sun relay system which operated the light and to repair the light or give warning that the light was not operating. The Supreme Court stated:

"The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby by caused to petitioners, the United States is liable under the Tort Claims Act." 350 U.S. 61, 69, 76 S. Ct. 122, 126.

Holding that the Government was under an obligation to exercise "due care," the Supreme Court remanded the case for trial on the specific acts of negligence alleged in the complaint.

Under the Federal Tort Claims Act the United States assumes liability for

loss of property caused by an employee to the same extent and in the same manner as a private individual under like circumstances. Even when liability is predicated on activity of a type traditionally undertaken by government, the historically circumscribed obligation of a municipal corporation is not the standard by which to measure the liability of the United States. Rayonier, Inc., v. United States, 1957, 352 U.S. 315, 77 S. Ct. 374, 1 L.Ed.2d 354.

In this action the claim against the United States is for negligence.[1] Negligence can be conceptualized into three components: (1) the existence of a duty on the part of a defendant toward the plaintiff; (2) the breach of this duty; and, (3) a proximate relationship between this breach of duty and the loss sustained by the plaintiff. To establish its right to recovery, Russell asserts that the United States had actual or constructive knowledge that the buoys were out of position so that the Government's failure to warn mariners or reset the buoys constitutes negligence. To narrow the issue, it is well to note that Russell does *not* claim that the United States improperly secured or maintained the buoys or caused them to be out of position. All Russell contends is that the United States knew or should have known that the buoys were displaced and failed to act diligently.

There is no evidence supporting a finding that employees of the United States actually knew, prior to the accident, that the buoys were off their charted position. Hence, to prove a "negligent or wrongful act or omission" under the Federal Tort Claims Act, Russell can recover only if the evidence establishes that the buoys were displaced long enough before the accident that employees of the United States should have so known in the exercise of due care.

That this is the proper standard by which to determine the liability of the United States is confirmed both by reason and precedent. Analogy can be drawn to the statute by which an owner of a vessel, sunken in a navigable channel, is obligated to mark the wreck with a buoy:

§ 409. " * * * And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidently or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful * * *." 33 U.S. C.A. § 409.

In construing what constitutes "neglect or failure," courts have used the due diligence standard of negligence and have not imposed absolute liability. See, e. g., Berwind-White Coal Mining Co. v. Pitney, 2 Cir., 1951, 187 F.2d 665; Sullivan v. Sanford Ross, Inc., 2 Cir., 1920, 263 F. 348. This standard has also been applied when the wreck belonged to the United States, which had waived its immunity under the "Suits in Admiralty Act", 46 U.S.C.A. § 741 et seq. and accepted the same obligation as borne by a private shipowner. See Eastern Transportation Co. v. United States, 1927, 272 U.S. 675, 47 S.Ct. 289, 71 L. Ed. 472. The applicable principle is well illustrated by a recent case involving a tug which hit an unmarked sunken barge. The owner of the unattended barge was held liable because his agents failed to act diligently from the time they learned that the barge had sunk. Berwind-White Coal Mining Co. v. Pit-

[1] As Russell does not contend that liability here exists absent negligence it is not necessary to point out by extended discussion that the maintenance of buoys is not the type of activity to which liability without fault attaches. See Harper & James, Torts, §§ 14.1–14.16 (1956). Neither is. it necessary to determine whether fault must be proved to recover under the Federal Tort Claims Act. See Id. at § 14.14.

ney, supra. See, also, Griffin, Collision, § 265(1949).

Applying this standard to the case at hand precipitates a crucial question: How long were the buoys displaced prior to the accident? There is no evidence showing that buoys have a tendency to slowly drift so that a displacement of 75 yards could represent a movement of many hours. Neither has it been shown that the dredge working in the area caused the displacement of the buoys. Instead, tugs have been identified as the principal cause of buoy movement: this results from the fouling of buoy chains by towing lines which thus draw the marker off its position. Although it is possible to conclude that a tug was the culprit, the evidence fails to indicate whether the buoy was so displaced five minutes or five hours prior to the casualty. Thus the record contains insufficient evidence upon which a reasonable inference can be drawn as to the time the buoy was off position prior to the accident. Hence, there is no basis for charging the Government with constructive notice. Russell has failed to prove that the buoys were out of position sufficiently long prior to the accident that the employees of the United States should have known of their displacement. Admittedly, proof of this fact is difficult. Nevertheless it forms a necessary element of plaintiff's negligence claim so that failure of proof here precludes recovery against the United States.[2]

Shifting its position Russell asserts that the goverment inspector on the dredge should have noticed prior to the casualty that the buoys were off position. While it has been established that a government inspector was on the dredge during this period, the record fails to adumbrate the scope of his responsibility in regard to the buoys. Furthermore, to charge the inspector with constructive knowledge it is essential to prove that the buoys were displaced long enough before the accident that he could be properly charged with knowledge of the condition. Thus Russell's contention is defective for it has not been established how long the buoys were out of position prior to the accident.

On the basis of the testimony and exhibits presented at trial, the Court finds as a fact that employees of the United States did not, prior to the accident, have constructive knowledge of the buoys' displacement. Accordingly, the Court concludes that the United States is not liable for the loss sustained by the barge Russell-Polling No. 29.

### Liability of the Tug

■ As to Conners-Standard Marine, owner of the tug Corporal, Russell contends that improper towing caused the injury to the barge Russell-Polling No. 29. More specifically, it is alleged that the barge hit bottom because it was towed into shallow water so that the tug is liable. It is well established that a tug has no liability absent fault for loss sustained by its tow; the obligation of the tug is merely to exercise due care. See Stevens v. The White City, 1932, 285 U.S. 195, 52 S.Ct. 347, 76 L. Ed. 699.

■■ The testimony and documents presented at trial indicate that buoys are merely *aids* to navigation. As such it is improper to rely upon them exclusively when other sources of information are available. Of course, buoys are the most immediate source of information available to those navigating in a narrow channel, especially in the absence of prominent landmarks whose distance can be readily and accurately estimated. In the area of the Tremley Point Reach near Buoy 20 there are no reliable landmarks visible at night by which a navigator can determine that the channel buoys are wide of their charted positions. When the barge hit bottom the tug Corporal was a proper distance from Buoy 20 so that safe passage would have been achieved had the buoy been in posi-

---

2. Proof of constructive notice is a frequent but often difficult method by which breach of duty is established. For a masterful analysis of the problems involved see 2 Harper & James, Torts, § 19.4 at pp. 1072–1074 (1956).

tion. Because of the difficulty in accurately judging distance over water at night, and the absence of lighted structures on the shore, the pilot of the Corporal failed to ascertain that the buoy and hence the tow were out of the main channel. Under the circumstances this failure was not the result of culpable conduct on the part of the pilot. The Court finds that the pilot of the Corporal exercised due care in navigating the tow and that he was not negligent in navigating by the buoys or in failing to discover that they were out of position. Accordingly, the Court concludes that Conners-Standard Marine is not liable for the loss sustained by the barge Russell-Poling No. 29.

Judgment shall be entered for the defendant and the third-party defendant in the civil action and for the respondent in the admiralty action.

This opinion shall constitute the findings of fact and conclusions of law of the Court.