HUDSON WATERWAYS CORPORA-
TION and Seatrain Lines,
Inc., Plaintiffs,

v.

UNITED STATES of America, Defendant
and Third-Party Plaintiff,

v.

S.S. SEATRAIN OHIO, her engines,
boilers, etc., Third-Party Defendant.

No. 73 Civ. 3940.

United States District Court,
S. D. New York.

June 22, 1976.

---

Burke & Parsons, New York City, for plaintiffs; Raymond J. Burke, Jr., New York City, of counsel.

Paul J. Curran, U. S. Atty., Admiralty & Shipping Section, Dept. of Justice, New York City, for defendant and third-party plaintiff; Philip A. Berns, New York City, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

Plaintiffs, Hudson Waterways Corporation ("Hudson") and Seatrain Lines, Inc. ("Seatrain"), seek to recover $340,000 for damages sustained by the S.S. Seatrain Ohio ("Ohio"), while the vessel was operating under a time charter with defendant, United States of America, through the Department of the Navy, Military Sealift Command. Defendant has waived its sovereign immunity and consented to be sued, for the claims here asserted, under the suits in Admiralty Act, 46 U.S.C. §§ 741–752, and the Public Vessels Act, 46 U.S.C. §§ 781–790.

The action was commenced by Hudson, a New York corporation, which was the owner of the vessel at the time the injury was sustained.[1] Hudson claims that defendant was negligent in failing to properly place and maintain the aids to navigation in the area where the incident occurred which resulted in the damage to its vessel. Additionally, Hudson asserts that defendant breached certain charter party warranties. However, Hudson had not been a party to the charter. Therefore, Seatrain, Hudson's parent corporation and the owner party to the charter, was added as a plaintiff in order that the warranty claims could be asserted. Both the tort and warranty claims are presently before this Court for determination.[2]

The vessel was impleaded as a third-party defendant by the Government in order that all aspects of *in rem* and *in personam* liability could be adjudicated.

1. Defendant is the current owner of the vessel, S.S. Seatrain Ohio.

2. The parties agreed, in a Consent Order entered into on May 8, 1975, to waive any asser-

### A. Stipulated Facts

Certain facts are not in dispute. On February 3, 1972, the Ohio suffered bottom damage while operating in Vietnamese waters in the Vung Tau area. The parties have agreed that at all relevant times this area was part of a war zone and that at the time of the incident the vessel was operating under a time charter party entered into between the Department of the Navy, Military Sealift Command, and Seatrain. The Ohio, a freighter with a gross tonnage of 8,047, and an overall length of 559 feet 11 inches, had, at the time of the incident, a draft of 19 feet 6 inches forward and 21 feet 4 inches aft. The Vung Tau channel, through which the vessel had to pass, had a charted depth at its center of 24 feet.

Prior to the incident on February 3rd, the Ohio had made eight successful transits through Vung Tau channel during 1971 and 1972. Subsequently, during March 1972, the Ohio made two additional transits, both without incident. The parties have additionally stipulated that located on the northerly side of the Vung Tau Inner Channel was a nun-type aid to navigation buoy, designated as buoy number 4.

### B. The Evidence

#### 1. The Touching

On the morning of February 3, 1972, the Ohio was berthed at the De Long pier in Vung Tau, Republic of Viet Nam. Cargo operations on the Ohio were completed at approximately 7:00 A.M. that morning. Originally, the vessel had been scheduled to sail for Taiwan at 4:00 P.M.

At approximately 8:00 or 9:00 A.M. on the third, Lieutenant Junior Grade Tappan Jennings, United States Navy, the Officer-in-Charge of the Military Sealift Command Unit in Vung Tau, approached the Master of the Ohio, Captain Nicholas Ghiz, and requested that the vessel sail at 11:00 A.M. in order that another ship could be berthed

tion that the warranty claims lie within the purview of the disputes clause of the charter party.

at the pier. Captain Ghiz informed Lieutenant Jennings that a union contract required that the crew be given eight hours notice before all departures and that an 11:00 A.M. departure was, therefore, not possible. It was, however, agreed that the ship would sail at noon, provided that the entire crew was aboard. Apparently, the union contract requirement was Captain Ghiz's prime consideration and the factor that led to the compromised departure schedule.

A noon departure involved a transit through the channel during slack low tide, whereas a 4:00 P.M. transit would have occurred during a high water phase.[3] It should be noted that Lieutenant Jennings testified that he was aware of and considered the tide conditions when he made the request for the change in sailing time, but that he could not recall being questioned by Captain Ghiz about the low water condition. On the other hand, Captain Ghiz testified that he complained to the Lieutenant of the low water condition as well as the union contract requirement.

At noon on February 3rd, the entire crew was aboard and the ship prepared for departure. Captain Ghiz testified that the weather conditions were ideal, the wind was easterly at four miles per hour, visibility was unlimited, and the sea was smooth. At 12:19 the Ohio was clear of the DeLong pier, with the master, the mate on watch, the quartermaster, and a Vietnamese local pilot on the bridge. In addition, the chief mate was stationed on the bow and the second mate on the stern.

Captain Ghiz was an experienced Merchant Marine officer and had been the Ohio's master for approximately five and one half years, during which time he had occasion to transit the Vung Tau Channel "at least a dozen times." The Captain testified that, upon the vessel's departure from Vung Tau, she was in possession of the latest charts of the area and that the pilot had assured him that there was at least 24 feet of water in the Channel at low tide. With the Ohio's draft of 21 feet 4 inches, it was decided that there was no reason to anticipate any problem due to prevailing tidal conditions.

Leaving Vung Tau harbor, the Ohio proceeded out into the Channel. The Captain testified that during the Channel transit the ship's position within the Vung Tau Inner Channel was determined by two methods. First, the vessel was directed seaward and was steered to stay within the confines of the Channel as marked by the buoys on both sides. Second, ranges were regularly visually checked so as to maintain a course in the center of the Channel. The ship's course was continually changed as required by these observations. Captain Ghiz explained that gyro bearings were not used because the ranges were taken astern.

At 12:27 the vessel passed beam to starboard of buoy number 8. The next buoy, number 6, was passed at 12:31, with the vessel continuing at maneuvering speed, half speed ahead. Having passed buoy number 6, the Ohio approached temporary buoy number 4. The ship's speed was increased to maneuvering speed, full speed ahead. At 12:39, approximately four minutes after the speed was increased, the vessel experienced a slight tremor, indicating that the hull had touched something. Captain Ghiz testified that immediately upon feeling the tremor he ordered that the ship's speed be reduced to half ahead and that the crew check for damage. The Captain also testified that he had asked the pilot for an opinion as to what the ship might have encountered. Captain Ghiz related that the pilot responded to the effect that the ship "may [have] touched a shoal spot, which is not uncommon in this channel, due to there being strong currents in the area and mud and silt settling in the channel."

Temporary buoy number 4 was passed at 12:40. With the initial damage investigation revealing no apparent damage, the ves-

3. The tide table for February 3, 1972 indicates that low tide occurred at 1107 hours (11:07 A.M.), and high tide at 1745 hours (5:45 P.M.).

sel resumed full speed ahead at 12:41. The Vung Tau Channel was cleared at 12:43 and the pilot disembarked at 13:06. It was at the latter time that Captain Ghiz first noticed oil trailing the vessel's stern and that a second damage investigation was ordered. Thereafter, the ship began to list slightly to port and soundings revealed that she was taking on sea water.

At 14:15, after consulting with the Sealift Command in Vung Tau, Captain Ghiz reversed course to return to Vung Tau for a hull bottom inspection. The inspection by United States Army scuba divers revealed a jagged hole in the forward area of the vessel's hull, approximately eight feet long, one to three feet wide, and located about three feet below the water line on the port side.

2. *The Locations of the Ohio and of Buoy Number 4.*

In order to recover, plaintiffs most prove that the damage to the Ohio was proximately caused by some fault of the defendant. Plaintiffs contend that the Ohio was properly navigated and that either the Ohio was outside the Channel because buoy number 4 was off-station or that the Ohio was inside the Channel but the Channel was in an unsafe condition due to an obstruction. Plaintiffs argue that defendant is liable for failure to maintain the aids to navigation if the former is true and failure to maintain the Channel if the latter is true. Essential to the former theory is proof of the location of buoy number 4 and essential to the latter is proof of the location of the Ohio at the time of the touching. Accordingly, considerable evidence was adduced relative to the position of the ship and the position of buoy number 4.

As proof of the location of the ship, plaintiffs introduced the testimony of Captain Ghiz. He testified that, at the time of the

touching, "Buoy Number 4 was bearing approximately 45 degrees on the starboard bow and . . . we were almost abeam of Buoy Number 4." He further indicated that the buoy was approximately 50 yards from the ship's bridge. On cross-examination, he indicated that, since the Ohio's bridge was located in the after end of the vessel, approximately 100 feet from the stern, the buoy could have been abeam of the bow and 45 degrees from the bridge. Although the Captain expressed the view that at the time of the touching the ship was in center channel, he admitted that no one was actually checking the range at the instant the touching occurred. He further admitted that it was not until a couple of minutes after the touching that he, personally, checked the range. No fix of the site of the touching was ever made.[4] Rather, the Captain merely estimated the Ohio's position at the time of the touching and marked the chart accordingly. Through no fault of any of the parties, this chart could not be produced.

In view of the foregoing, the Court cannot attach great weight to the testimony of Captain Ghiz concerning the position of the Ohio at the time of the touching. Two reports filed by the Captain, on February 4 and 11 respectively, are in conflict on this crucial issue and recite different geographic fixes for the actual site of the touching.[5]

Captain Ghiz's recollection of the incident is also questionable in light of his testimony concerning the speed of the ship as it passed through Vung Tau Channel. Taking into consideration the various conditions that would affect the ship's speed, Captain Ghiz estimated the speed at between six and eight knots. When counsel for the government suggested that if the ship was traveling at 7 knots, it would be proceeding at 699 feet per minute, Captain Ghiz responded that such speed was "a little excessive"

---

4. The fact that a navigational fix was neither taken nor plotted was stipulated to, by the parties, in the Consent Pre-Trial Order entered into on April 17, 1975.

5. *Compare, Report of Vessel Casualty or Accident,* submitted by Captain Ghiz on February 4,

1972, which locates the incident at "Lat. 10–23.7N." (Plaintiffs' exhibit 57), *with, Marine Notice of Protest,* filed by Captain Ghiz on February 14, 1972, which places the touching at approximately "Lat. 10–04E." (Plaintiffs' exhibit 60).

and that he doubted that he was going that fast.

Dividing the time which elapsed between the passing of buoys 8 and 6 into the distance between these buoys (assuming the buoys were on their charted positions), it was estimated that between buoys 8 and 6 the Ohio was traveling at approximately 810 feet per minute, or about 8.1 knots. The same formula resulted in a 453 feet per minute calculation, or approximately 4.5 knots, for the vessel's speed between buoys 6 and 4.

However, the Captain's prior testimony indicated that between buoys 8 and 6, the ship's speed was half ahead, whereas between buoys 6 and 4, the speed was full ahead. When asked whether the speed as calculated could be correct in light of his prior testimony, the Ohio's master suggested that "[i]t could be that the current was stronger [between buoys 6 and 4]." When questioned further concerning the possibility of a stronger current, Captain Ghiz stated that he could not recall any difficulty maintaining the vessel's position between buoys 6 and 4. It should be noted, however, that on direct examination the Ohio's master had earlier testified that at the time the ship was in the vicinity of buoy number 4, the tide was commencing to flood and that this would set the ship in a northeasterly position.

A key element in plaintiffs' claim for recovery is their allegation that the touching occurred because buoy 4 was off-station. Although a great deal of testimony related to the description of buoy 4, its mooring, and its location, the parties have stipulated to the fact that buoy 4 was of the nun variety.

For their contention that buoy 4 was off-station, plaintiffs rely on the so-called Gaffney report. At the time of the incident, Lieutenant Gaffney was the Navy's Oceanographic Officer in Viet Nam and, as such was the American advisor to the Vietnamese Hydrographic Survey Team. In light of the Ohio incident, the Sealift Command requested that the buoy 4 area be surveyed; it was the duty of a Vietnamese Survey Team to conduct such surveys. This report indicated that buoy 4 had drifted from its original position and that its primary anchor rested in only 17 to 18 feet of water during low tide. Soundings reportedly made by the Survey Team in the immediate vicinity of buoy 4 revealed no foreign obstructions, and the Team reported that the Channel bottom was composed of mud and sand. The report stated that buoy 4 was anchored by a tripod or three-legged moor. The inspection of the mooring, as reported, indicated that it was "badly scarred and gouged." Based upon this finding, Lieutenant Gaffney reported that the Vietnamese Survey Team had concluded that the "Ohio probably hit the primary anchor and anchor chain of temporary buoy # 4."

Several factors militate against the reliability of the Survey Team's findings and, therefore, of the Gaffney report and any conclusions made by other persons which were predicated upon the report. First, the Gaffney report was entirely based upon the oral report made to Lieutenant Gaffney by the Vietnamese Survey Team, following the latter's inspection on February 21 and 22. Neither Lieutenant Gaffney, nor any other American, accompanied the Survey Team or made any independent investigation. Second, contrary to the facts as stipulated by the parties, the report and its accompanying sketches indicate that buoy 4 was not of the nun variety. Third, substantial testimony was received from United States Coast Guard personnel, all to the effect that the Coast Guard never issued tripod moorings, but rather that single chain moorings were standard and that mooring or can buoys were never used as aids to navigation.

The testimony of Coast Guard Chief Boatswain's Mate Jimmie Dunahoe provided a specific description of temporary buoy 4. The Chief's description was in full accord with the standard Coast Guard procedure relating to aids to navigation, as well as all Coast Guard records respecting buoy

4. Chief Dunahoe had served on the Coast Guard's Saigon aids to navigation detail for several years, as well as on Coast Guard buoy tenders which were periodically detailed to Viet Nam. The Chief testified that, while assigned to the Saigon aids detail, he had occasion to assist in the establishment of temporary buoy 4. Dunahoe's recollection of this event was quite specific because of the rather unique method by which the buoy was set. His testimony firmly established that buoy 4 was of the standard Coast Guard nun variety, with a single 45 foot chain attached to a single concrete sinker. The buoy card, maintained by the Coast Guard for buoy 4, although incomplete with respect to other details, is in accord with the Chief's recollection.[6] The testimony of Commander Gordon Dickman, the Coast Guard aids to navigation coordinator for Viet Nam during 1969 and 1970, further corroborates Chief Dunahoe's testimony. Although the precise reason that buoy 4 was designated as "temporary" was never firmly established, Lieutenant Commander Arthur Sharkey, United States Coast Guard aids to navigation coordinator in Saigon between August of 1970 and of 1971, testified that he was informed that the temporary designation was used whenever a buoy was replaced by another aid, and the latter had different characteristics than its predecessor. Commander Sharkey further indicated that he had been informed that the aid at the buoy 4 position was designated as temporary when a lighted aid was replaced by the standard unlighted nun buoy which was present at the time of the Ohio's touching. In any event, it is clear that the fact that buoy 4 was designated temporary had no relevance to the Ohio's incident.

Another factor militating against the reliability of the Gaffney report is that it indicates that the navigational fix used by the Survey Team as the chartered or original position of buoy 4 was incorrect. One of the sketches which was attached to the Gaffney report indicates that the Survey Team thought that the charted position of buoy 4 was approximately 107 degrees, 4 minutes, east longitude. However, all of the Naval and Coast Guard charts indicate that, prior to the incident on February 3rd, buoy 4 was charted at 107 degrees, 3 minutes, 53.2 seconds, east longitude. No explanation of this discrepancy has been provided. Furthermore, although there is no evidence that buoy 4 was reset after the incident on February 3rd, the Notice to Mariners, prepared by the United States Naval Oceanographic Office and the United States Coast Guard and dated March 18, 1972, reported that the position of buoy 4 continued to be 107 degrees, 3 minutes, 53.2 seconds, east longitude. Therefore, with respect to three objective characteristics of buoy 4—body type, mooring, and location—the report by the Vietnamese Survey Team, as embodied within the Gaffney report, is contrary to other independent and reliable evidence.[7]

There are several additional factors, some of which are also inconsistent with the Gaffney report, which should be considered in determining the position of the Ohio, as well as the position and therefore the culpability of buoy number 4. First, the muddy composition of the bottom of the Vung Tau channel provided an excellent holding bottom for a buoy mooring by creating both a natural vacuum and by encompassing the sinker very rapidly. Second, all of the Coast Guardsmen who testified on the question stated that they had no recollection of ever being informed that buoy 4 was off station. They further testified to a lack of knowledge of any prior incidents in the

---

6. Buoy cards were maintained by the United States Coast Guard as a work sheet and general record for all aids to navigation.

7. At trial, the government raised an objection when plaintiffs offered exhibit 1, which includes the Gaffney report. Following argument by counsel for both parties, the Court stated, " . . . the objection is overruled. The marine casualty investigation report is received, but I caution counsel that the weight which I give various portions of this will depend on all the circumstances presented during the course of the trial." Trial transcript, p. 50.

buoy 4 vicinity. In addition, George O'Brien, the Commanding Officer of the Coast Guard buoy tender Blackhaw, which was deployed to Viet Nam between August 1969 and July 1971, testified that at least once during every deployment in Viet Nam every buoy's position was checked by sextant angles. During the period that a buoy tender was assigned to Viet Nam, the vessel spent approximately every second six weeks deployed in that country. O'Brien further indicated that if a buoy was passed by a tender on additional occasions during a single six-week deployment, the buoy's position on these additional times was at least checked by visually determining whether it was in line with the other buoys in the vicinity. According to the Blackhaw's logs, buoy 4 was last checked by that particular vessel on February 5, 1971, at which time the buoy was pulled up onto the tender's deck. This procedure indicated that buoy 4 was moored by a single chain device. After the buoy was serviced, it was reset on its charted position.

The last tender to service the Vung Tau aids was the Basswood, which made two trips to Viet Nam. The first, prior to the Ohio's touching, occurred between October and December of 1971. The tender's second trip, between March and May 1972, followed the Ohio's incident. Lieutenant Commander Edwin Lockwood, during both trips to Viet Nam the Commanding Officer of the Basswood, referring to the Basswood's logs for the first trip, explained that the absence of a specific notation concerning buoy number 4 indicated that the buoy was checked by a small boat which had been dispatched by the tender and that the buoy had been found to be "watching properly." On October 31, 1971, the Basswood informed the Coast Guard in Viet Nam that all Vung Tau inner harbor buoys had been serviced and were on station. The Basswood's records for the second trip to Viet Nam, however, contain an entry dated April 29, 1972 which indicates that buoy 4 was missing.

Also, Commander Sharkey testified that, given Captain Ghiz's testimony as to the position of the Ohio relative to buoy 4, as well as the length of the buoy's mooring chain, it was physically impossible for the Ohio to pass over the buoy's sinker. Based upon the survey team's sketch of the channel area in the buoy 4 vicinity which was included in the Gaffney report and the testimony of Captain Ghiz as to the Ohio's position relative to the buoy, Commander Sharkey also indicated that the Ohio would have been outside of the Channel. However, this conclusion is fully dependent upon the accuracy of the survey team's sketch and, as previously indicated, the reliability of this report is, at best, questionable. Commander Sharkey additionally testified that if the Ohio had been on range, she would have been traveling over the approximate center of the Channel. He therefore concluded that the vessel could not have encountered buoy 4 if the buoy was located 40 to 50 meters north of the Channel as the survey team reported. Furthermore, Commander Sharkey indicated that if the Ohio had been 50 yards off-range, this fact would have been "readily distinguishable" to the vessel's master.

In short, the Gaffney report and its findings must be rejected as contrary to the overwhelming weight of the credible evidence. Other possible explanations for the casualty have been offered. The evidence indicates that a shoaling condition existed in the vicinity of buoy 4 and that it was caused by the prevailing currents and soft bottom in the area. This condition would likely have affected both the location of the center and the depth of the Channel. Commander Sharkey, who was stationed in Viet Nam between August 1970 and 1971, testified that when he first arrived in Viet Nam the Vung Tau Channel was dredged by the Army Corps of Engineers quite frequently, approximately two weeks of each month. He indicated that this almost "constant" dredging was necessary because of the considerable silting in the Channel. However, the Commander indicated that shortly after he left Viet Nam, the dredge was required to maintain other ports in Southeast Asia. He therefore estimated that, during the

period between March or April 1971 and the incident in February 1972, the Vung Tau Channel was dredged for a total period of only about 15 days. Sharkey, therefore, speculated that the Channel and its ranges may have been slightly different in February of 1972 than they were when he left Viet Nam in August of 1971. However, plaintiff did not present any proof which would even suggest that the Channel on February 3, 1972 was, in fact, different than was indicated on the charts. Furthermore, the Ohio's touching was the only incident that occurred in the area. Finally, it was the view of George O'Brien that a mud and sand build-up in the Channel would merely ground a vessel the size of the Ohio and would not gash the hull.

The Coast Guard officer in charge of the Merchant Marine Detail in Saigon between the middle of 1971 and of 1972, Captain Walter Alvey, filed a "cause-and-effect letter" dated April 5, 1972, wherein he expressed his views as to the causes and effects of the Ohio touching. Although in the letter the Captain attributed the damage to an unidentified submerged object, he later testified that at the time that he wrote the letter, he had envisioned that the Ohio had encountered a sunken barge. He indicated that he had heard of the sinking of a barge somewhere in the area and opined, based upon a prior experience, that a sunken barge that had not yet lost all of its buoyancy could have drifted into the Channel and been struck by the Ohio. But, as Captain Alvey stated, no barge was found; presumably he concluded that the barge could have continued to drift and drifted out of the buoy 4 area. In evaluating the Alvey barge theory, it must be noted that Captain Alvey only considered the various reports and material that had been filed following the touching. Captain Alvey relied most heavily upon the Gaffney report and the condition of the expansion shell of the Ohio's hull. The unreliable nature of the Gaffney report has been previously discussed. It should also be noted that Captain Alvey relied upon the Gaffney report believing that Lieutenant Gaffney had personally conducted the investigation. Alvey, from the depiction of the Ohio's hull damage as indicated by the condition of the expansion shell, felt that a buoy mooring would not have likely caused the type of damage that was indicated by the sketch. However, Captain Alvey only saw the expansion shell sketch and never viewed either the Ohio or photographs of her damaged hull. Further, Captain Alvey apparently recognized that his barge theory was mere supposition and, therefore, decided not to include the theory in his report. Taking into consideration all of the factors relevant to the Alvey barge theory requires that the theory be rejected as mere conjecture.

### 3. Duty to Maintain Aids to Navigation

A key element in plaintiffs' negligence claim is their assertion that defendant had the duty to properly maintain the aids to navigation in the Vung Tau Channel and that it breached that duty. The government concedes that it undertook the task of establishing and maintaining a system of aids to navigation in Viet Nam and that this responsibility was assigned to the Coast Guard. However, defendant argues that, prior to February 3, 1972, the responsibility for maintaining the aids in the Vung Tau Channel had been turned over to the Republic of Viet Nam as part of the Vietnamization program. It is clear that planning for the turning over of the responsibility for aids to navigation to the Vietnamese had begun in the latter part of 1970. Coast Guard records indicate that on November 17, 1971, the Coast Guard received a message from the Director of Navigation for the Republic of Viet Nam indicating that the Vietnamese would take over the aids at Vung Tau on December 1, 1971. Records for December 2, 1971 indicate that the Coast Guard had received formal notification of the willingness of the Vietnamese to accept responsibility for the aids in Vung Tau and that it was expected that an agreement would be formally executed. Although various witnesses testified that they

believed that they had seen the formal agreement, no such document has been produced. Nevertheless, on January 17, 1972, the Senior Coast Guard Officer in Viet Nam dispatched a letter to the Director of Navigation of the Republic of Viet Nam in which he stated that unless notified to the contrary, the United States Coast Guard would assume that the Vietnamese had accepted responsibility for the aids in Vung Tau. Apparently, no notice to the contrary was received by the Coast Guard. The testimony of the ranking Coast Guard officers in Viet Nam during this period, Commander Peter Corson, the Senior Coast Guard Officer in Viet Nam, and Lieutenant Commander Alfred Harrell, the Aids to Navigation Coordinator, establishes that as of January 17, 1972 the Coast Guard in Viet Nam considered the Vung Tau area to be the responsibility of the Vietnamese. Coast Guard communications dated February 8, 1972 support this testimony. However, on February 1, 1972, the Commander of Coast Guard District 14 sent a message to the Coast Guard in Viet Nam indicating that the turnover of aids to navigation be delayed. The 14th District Command was superior, in the chain of command, to the Coast Guard in Viet Nam. Commander Corson explained that this message from his higher command and the latter's lack of an accurate understanding of the status in Viet Nam was due to the rapidly changing situation in Viet Nam. Furthermore, he testified that he understood it to be his duty to turn over responsibility to the Vietnamese as quickly as possible and that there was generally little communication between the Coast Guard in Viet Nam and the 14th District Command.

Coast Guard records indicated, and Commander Harrell testified, that the Vietnamese were not considered to be capable of properly maintaining a system of aids to navigation. Furthermore, Coast Guard records indicate that complaints had been received from merchantmen concerning the condition of aids to navigation throughout Viet Nam. Nevertheless, the Coast Guard proceeded with the turnover to the Viet-namese of the responsibility for the aids. It should be noted, however, that no evidence was presented that the buoy 4 area was the subject of any of the complaints, and that Lieutenant Commander Harrell testified that he was not aware of any complaints involving buoy number 4. Commander Harrell further stated that all complaints received by the Coast Guard after January 17, 1972 were forwarded to the Vietnamese Lighthouse Service. The Commander also testified that the Coast Guard often had to pressure the Vietnamese in order to get them to correct deficiencies that had been reported concerning aids to navigation for which the Vietnamese had assumed responsibility. In a final effort to properly establish a complete aids to navigation system, the Coast Guard Buoy Tender Basswood was ordered to Viet Nam for an additional deployment. This final deployment was ordered primarily because of the increasing number of reported aid to navigation deficiencies. Vietnamese authorities had requested this additional deployment, asserting that the original turnover agreement between the two nations had provided that the United States would support the Vietnamese maintenance program for one year. As previously indicated, the final deployment of the Basswood occurred after the Ohio's incident.

Although the evidence as to the final turnover date of the aids to navigation responsibility for Viet Nam is somewhat confused, January 17, 1972 appears to be the date for the turnover of responsibility for the Vung Tau Channel aids.

C.  *Conclusion*

■  Liability for the damage sustained by the Ohio may not be placed upon defendant even if plaintiffs' argument that defendant was negligent for divesting itself of the responsibility for the aids to navigation is accepted. Liability cannot be solely predicated upon the recognition by United States Coast Guard officers that the Vietnamese were incapable of properly maintaining a system of aids to navigation.

Even accepting the view that the turnover of responsibility for the aids to an incapable authority may be considered a violation of a reasonable standard of care, plaintiffs in failing to prove the existence of a defect in the navigational integrity of the Vung Tau Channel have failed to establish the essential element of proximate causation. *Russell, Poling & Company v. United States,* 151 F.Supp. 11 (S.D.N.Y.1957), *aff'd,* 252 F.2d 167 (2d Cir. 1958). Therefore, without evidence sufficient to demonstrate that buoy number 4 was off-station, or that the Channel was otherwise defective or improperly maintained, and that such deficiency caused the damage to the Ohio, plaintiffs have failed to sustain their burden of proof. *Gulf Oil Corporation v. The Baltimore,* 47 F.Supp. 770 (E.D.N.Y.1942), *aff'd,* 142 F.2d 557 (2d Cir. 1944). In addition, plaintiffs utterly failed to establish the Ohio's location at the time of the incident. As previously indicated, plaintiffs' own evidence on this question suggests several possible locations. Therefore, the Ohio may well have strayed outside of the Channel due to its own navigational error and without any culpability attributable to the government. Plaintiffs' failure to place the touching within the Channel removes the necessity for this Court to reach the question of whether the charter party included either an expressed or implied warranty of safe port. Such a warranty could only be the basis of liability if the vessel sustained injury while either traveling within the warranted port area or after having strayed outside of the warranted area due to a defect in the aids to navigation system.

Plaintiffs contend that even if the ship strayed outside the Channel, this would be the result of the negligence of the Vietnamese pilot for whose negligence the defendant would be liable. They base their argument on the theory that the pilot, in navigating the vessel through the Channel, was the borrowed servant of the defendant. This contention cannot be sustained. Whatever merit plaintiffs' argument might have were the defendant chargeable with the navigation of the vessel, it is clear that under the terms of the charter party responsibility for the navigation of the Ohio remained with the owner. The master was the employee of the owner and responsibility for navigation was not shifted to defendant when he temporarily relinquished command to the pilot.

In failing to establish either the location of the vessel at the time of the touching, or that defects in the Channel or its aids to navigation system proximately caused the damage, plaintiffs have entirely failed to sustain their burden of proof. Accordingly, the Court finds that defendant is entitled to the entry of judgment in its favor.

The foregoing constitutes the findings of fact and conclusions of law of the Court for the purposes of Rule 52, Fed.R.Civ.P.

Settle judgment on notice.